RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, NY 10016
Phone: (212) 297-0700
Fax: (212) 297-0730

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL J. GRAZIANO,                                    Index No. 1:21-cv-2708

                    Plaintiff,

         -against-

FIRST UNUM LIFE INSURANCE COMPANY,

                    Defendant.

**PLAINTIFF MICHAEL J. GRAZIANO'S**
**BENCH TRIAL BRIEF ON A STIPULATED RECORD**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................................1

SUMMARY OF THE FACTS ..........................................................................................................3

ARGUMENT..................................................................................................................................11

I.   THE COURT SHOULD OVERTURN THE TERMINATION OF GRAZIANO'S
BENEFITS BECAUSE UNUM DENIED GRAZIANO A FULL AND FAIR
REVIEW...............................................................................................................................11

II.  A PREPONDERANCE OF THE EVIDENCE DEMONSTRATES THAT
GRAZIANO IS DISABLED UNDER THE STANDARDS SET FORTH IN THE
PLANS ..................................................................................................................................14

    A.   Graziano's Evidence Establishes Entitlement to Benefits Under the Standards
Set Forth in the Plans.......................................................................................................14

    B.   Unum's Evidence Is Insufficient to Shift the Balance of The Evidence in Its
Favor...................................................................................................................................32

III. AS A REMEDY, THE COURT SHOULD REINSTATE GRAZIANO'S
BENEFITS, OR, IN THE ALTERNATIVE, REMAND GRAZIANO'S CLAIM
BACK TO UNUM FOR ADDITIONAL DEVELOPMENT OF THE RECORD ............42

CONCLUSION................................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Alfano v. CIGNA Life Insurance Co.,*
    2009 U.S. Dist. LEXIS 7688 (S.D.N.Y. Jan. 30, 2009)........................................35

*Barbu v Life Insurance Co. of North America,*
    35 F. Supp. 3d 274 (E.D.N.Y. 2014) ..........................................................9

*Barnes v. Unum Life Insurance Co. of America,*
    2020 U.S. Dist. LEXIS 256497 (E.D. Tenn. Nov. 24, 2020) ............................40

*Bendik v. Hartford Life Insurance Co.,*
    2010 U.S. Dist. LEXIS 70978 (S.D.N.Y. July 12, 2010) ................................39

*Bendik v. Hartford Life Insurance Co.,*
    432 F. App'x 24 (2d Cir. 2011)................................................................39

*Black & Decker Disability Plan v. Nord,*
    538 U.S. 822 (2003).................................................................... 35, 39

*Boersma v. Unum Life Insurance Co. of America,*
    546 F. Supp. 3d 703 (M.D. Tenn. 2021)....................................................40

*Boykin v Unum Life Insurance Co. of America,*
    2022 U.S. Dist. LEXIS 27455 (E.D. Cal. Feb. 15, 2022) ................................40

*Brown v. UNUM Life Insurance Co. of America,*
    356 F. Supp. 3d 949 (C.D. Cal. 2019) ......................................................40

*Byrom v. Delta Family Care-Disability & Survivorship Plan,*
    343 F. Supp. 2d 1163 (N.D. Ga. 2004) ................................................35-36

*Carney v UNUM Life Insurance Co. of America,*
    2022 U.S. Dist. LEXIS 61212 (E.D. Mich. Mar. 31, 2022) ..............................40

*Chicco v. First Unum Life Insurance Co.,*
    2022 U.S. Dist. LEXIS 37946 (S.D.N.Y. Mar. 3, 2022) ..................9, 34, 40, 42

*Chicco v. First Unum Life Insurance Co.,*
    2022 U.S. Dist. LEXIS 59742 (S.D.N.Y. Mar. 30, 2022) ................................42

*Christoff v. Unum Life Insurance Co. of America,*
    2019 U.S. Dist. LEXIS 167889 (D. Minn. Sep. 30, 2019)................................40

*Clark v. Unum Life Insurance Co. of America,*
    2018 U.S. Dist. LEXIS 175341 (M.D. Tenn. Oct. 10, 2018)..............................40

*Connors v. Connecticut General Life Insurance Co.,*
    272 F.3d 127 (2d Cir. 2001) ................................................................................35

*Cook v. New York Times Co. Group Long Term Disability Plan,*
    2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 30, 2004).......................................11

*Dewsnup v. Unum Life Insurance Co. of America,*
    2018 U.S. Dist. LEXIS 208688 (D. Utah Dec. 10, 2018)....................................40

*Diamond v. Reliance Standard Life Ins.,*
    672 F. Supp. 2d 530 (S.D.N.Y. 2009)..................................................................34

*Dwyer v. Unum Life Insurance Co. of America,*
    548 F. Supp. 3d 468 (E.D. Pa 2021)..........................................17-18, 35, 39, 40, 41

*Easter v. Cayuga Medical Center at Ithaca Prepaid Health Plan,*
    217 F. Supp. 3d 608 (N.D.N.Y. 2016) .................................................................43

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101 (1989)..............................................................................................14

*Fleming v. Unum Life Insurance Co. of America,*
    2018 U.S. Dist. LEXIS 200400 (C.D. Cal. Nov. 20, 2018) .................................41

*Halo v. Yale Health Plan,*
    819 F.3d 42 (2d Cir. 2016) ...................................................................................43

*Hannon v. Unum Life Insurance Co. of America,*
    988 F. Supp. 2d 981 (S.D. Ind. 2013)...................................................................41

*Johnson v. Guardian Life Insurance Co. of America,*
    2017 U.S. Dist. LEXIS 178061 (D. Conn. Oct. 27, 2017) ..................................34

*Khan v. Provident Life & Accident Insurance Co.,*
    386 F. Supp. 3d 251 (W.D.N.Y. 2019)..................................................................34

*Kinstler v. First Reliance Standard Life Insurance Co.,*
    181 F.3d 243 (2d Cir. 1999) .................................................................................42

*Lasser v. Reliance Standard Life Insurance Co.,*
    146 F. Supp. 2d 619 (D.N.J. 2001) .......................................................................16

*Lasser v. Reliance Standard Life Insurance Co.,*
    344 F.3d 381 (3d Cir. 2003) .................................................................................16

*Lockhart v. Jefferson Pilot Financial Insurance Co.,*
    2009 U.S. Dist. LEXIS 26809 (N.D. Ill. Mar. 31, 2009) ....................................16

*Magee v. Metropolitan Life Insurance Co.,*
  632 F. Supp. 2d 308 (S.D.N.Y. 2009) .................................................................43

*Martin v. Hartford Life & Accident Insurance Co.,*
  478 F. App'x 695 (2d Cir. 2012) .......................................................................43

*McDonnell v. First Unum Life Insurance Co.,*
  2013 U.S. Dist. LEXIS 110361 (S.D.N.Y. Aug. 5, 2013) ....................................15

*McFarland v. General American Life Insurance Co.,*
  149 F.3d 583 (7th Cir. 1998) ............................................................................16

*Ostrowski v. Atlantic Mutual Insurance Cos.,*
  968 F.2d 171 (2d Cir. 1992) .............................................................................14

*Paese v. Hartford Life & Accident Insurance Co.,*
  449 F.3d 435 (2d Cir. 2006) .............................................................................14

*Rios v. Unum Life Insurance Co.,*
  2020 U.S. Dist. LEXIS 233953 (C.D. Cal. Dec. 10, 2020) ........................... 37, 41

*Rios v. Unum Life Insurance Co.,*
  2021 U.S. App. LEXIS 38138 (9th Cir. Dec. 27, 2021) ............................... 37, 41

*Shapiro v. Berkshire Life Insurance Co.,*
  1999 U.S. Dist. LEXIS 11789 (S.D.N.Y. Aug. 3, 1999) ...................................15-16

*Shapiro v. Berkshire Life Insurance Co.,*
  212 F.3d 121 (2d Cir. 2000) ...........................................................................15-16

*Shaw v. AT&T Umbrella Benefit Plan No. 1,*
  795 F.3d 538 (6th Cir. 2015) ..............................................................................9

*Tam v. First Unum Life Insurance Co.,*
  491 F. Supp 3d 698 (C.D. Cal. 2020) ...............................................................41

*Thoma v. Fox Long Term Disability Plan,*
  2018 U.S. Dist. LEXIS 209077 (S.D.N.Y. Dec. 11, 2018) ...................................42

*Tretola v. First Unum Life Insurance Co.,*
  2015 U.S. Dist. LEXIS 14666 (S.D.N.Y. Feb. 6, 2015) ......................................15

*Troy v. Unum Life Insurance Co. of America,*
  2006 U.S. Dist. LEXIS 14965 (S.D.N.Y. Mar. 31, 2006) ....................................42

*Vineyard Vines, LLC v. MacBeth Collection,* LLC,
  2018 U.S. Dist. LEXIS 205502 (D. Conn. Dec. 5, 2018) ....................................14

*Zappier v. Sun Life Assurance Co.*,
  2006 U.S. Dist. LEXIS 68537 (S.D.N.Y. Aug. 10, 2006) ................................................... 10


**Statutes**

29 U.S.C. § 1133 ........................................................................................................................ 11


**Regulations**

29 C.F.R. § 2560.503-1 ............................................................................................... 1, 11-12, 17


**Other Authority**

Lumbar Radiculopathy (Nerve Root Compression), Emory Healthcare,
https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html ....................... 39

Lumbar Spinal Stenosis, Johns Hopkins Medicine,
https://www.hopkinsmedicine.org/health /conditions-and-diseases/lumbar-spinal-stenosis .......... 39

Mirco Sgroi, M.D. et al., *Diagnostic Value of Clinical Tests for Supraspinatus Tendon Tears*, 34
Arthroscopy: The Journal of Arthroscopic & Related Surgery, Issue 8, 2326-2333 (Aug.
2018) .................................................................................................................................... 13

Substantial Gainful Activity, Social Security Administration, https://www.ssa.gov/oact/
cola/sga.html ....................................................................................................................... 18

## PRELIMINARY STATEMENT

The Court should grant judgment in favor of Plaintiff Michael Graziano for two reasons: (I) Unum deprived Graziano of a full and fair review; and (II) a preponderance of the evidence, under ERISA's default *de novo* standard of review, establishes Graziano is disabled under the terms of both the long term disability plan and the life insurance plan. The Court should therefore award Graziano benefits from January 3, 2020 through the present. However, should the Court find the evidence in the record to be insufficient to establish disability, the Court should not grant judgment Unum's favor. Instead, because Unum's actions unfairly prejudiced the development of the factual record, the Court should remand Graziano's claims back to Unum for a full and fair review and to further develop the factual record.

To provide a full and fair review, 29 C.F.R. § 2560.503-1(h)(3)(iii) requires an "appropriate named fiduciary," such as Unum, to "consult" with an appropriate "health care professional" when deciding an appeal of an adverse benefit determination that is "based in whole or in part on a medical judgment." Despite this requirement, Unum denied Graziano's appeal without consulting with an appropriate health care professional on two key pieces of evidence that Graziano submitted on appeal. Neither Dr. Scott Norris (the only doctor Unum consulted on appeal), nor any other health care professional, ever reviewed Graziano's medical records from Generations Physical Therapy or the October 29, 2020 report of his treating physician Dr. Jeffry Beer. This violation alone requires Unum's January 2, 2020 termination of benefits to be overturned.

Despite being prejudiced by Unum's unlawful denial, the record nonetheless contains sufficient evidence to reinstate Graziano's benefits under a *de novo* standard of review. A preponderance of the evidence demonstrates Graziano cannot perform his occupation as an underwriter and he cannot perform any gainful occupation because: (1) he cannot perform the sitting requirements; (2) he cannot perform the keyboarding requirements; (3) he cannot complete a normal

workweek on a sustained, reliable, and consistent basis; (4) he cannot meet the high-level cognitive demands; and (5) he cannot meet the business travel requirements. Graziano's inability to meet these demands is supported by ample evidence, including (a) the opinions of Graziano's long term treating physicians; (b) two objective functional capacity evaluations; (c) multiple MRIs and x-rays; (d) consistent and credible complaints of pain; and (e) the impartial decision of a Social Security Administrative Law Judge.

Against the weight of this wall of evidence, Unum has no direct evidence. Unum has no examination evidence, clinical findings, test results, or video surveillance. Unum relies only on the flawed reports of its non-examining paper reviewers. Namely, Unum relied on the reports of Dr. Scott Norris during the appeal process. Dr. Norris' opinions are based on an incomplete review of the record, were made without evaluating Graziano in person, and are internally inconsistent and contain multiple factual misstatements – the hallmarks of unreliability. In addition, Dr. Norris lacks credibility because he is a long-time employee of Unum and thus not independent. He has not treated a single patient since 2010, exclusively conducting paper reviews for Unum instead. The unreliability and poor quality of his reviews is well-known and often litigated. Courts around the country have regularly criticized Dr. Norris for the unsupported, selective, and incomplete record reviews that he performs on Unum's behalf. The opinion of Unum's most recent vocational reviewer also is unreliable because it is internally inconsistent and contradicted by the rest of the vocational evidence.

Judgment should be granted to Graziano because Unum failed to conduct a full and fair review and a preponderance of the evidence supports his disability claim. In the alternative, this Court should remand this matter to Unum for the full and fair review Unum has denied Graziano thus far.

## SUMMARY OF THE FACTS

### Background Information

Graziano is a 56-year-old former Senior Property Underwriter who worked at Swiss Re., an international insurance underwriting company, for twelve years. (380, 416, 456, 486-87).[1] His career was cut short on October 16, 2018, due to severe lumbar spinal and shoulder conditions including, but not limited to, multilevel degenerative disc disease, herniated discs, bilateral foraminal stenosis, central canal stenosis, nerve root impingement; bilateral shoulder osteoarthritis, multiple bilateral shoulder tendon tears, and a left hamstring tendon tear.[2] (368-69, 428, 954, 1788-91)

As a Swiss Re employee, Graziano received long term disability ("LTD") insurance coverage under the LTD Plan (Policy No. 405256 001) and life insurance waiver of premium benefits under the Life Plan (Policy No. 405256 002). (42-82, LWOP 52-114). The LTD Plan and the Life Plan were issued by First Unum Life Insurance Company ("Unum"). (Exs.[3] 4, 5).

### The LTD Plan

A claimant is disabled under the LTD Plan when "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (Ex. 4, p. 16). After 24 months, you are disabled when "you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." (*Id.*). Gainful

---

[1] Citations to numbers in parentheses are citations to the administrative record for Graziano's long term disability claim produced by Unum in this proceeding and filed today as Exhibit 2 to the Affirmation of Matthew Maddox. Citations to numbers in parentheses that begin "LWOP-" are citations to the administrative record for Graziano's life insurance waiver of premium claim produced by Unum in this proceeding and filed today as Exhibit 3 to the Affirmation of Matthew Maddox.

[2] Graziano has also been diagnosed with multiple comorbidities including morbid obesity and type II diabetes. (186; 1510; 1524; 1836; 1837; LWOP 138).

[3] Citations to "Ex." are to exhibits to the Affirmation of Matthew Maddox, filed today.

Occupation "means an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." (Ex. 4, p. 30).

**The Life Plan**

A claimant is disabled when "due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience." (Ex. 5, p. 34). Gainful Occupation means "an occupation that within 12 months of your return to work is or can be expected to provide you with an income that is at least equal to 60% of your annual earnings in effect just prior to the date your disability began." (Ex. 5, p. 52).

**Graziano's Regular Occupation**

Graziano worked as a "Senior Property Underwriter" for Swiss Re Group for 12 years. (523). This was his regular occupation. (380, 416, 456). Graziano's base annual salary was $153,000 in this occupation, which amounts to indexed monthly earnings of $12,750. (LWOP-10, 451).

Graziano's regular occupation was highly skilled and stressful. (456, 1736-37, 1772-75). Graziano was responsible for "[p]rofit-focused underwriting of new and existing accounts, as well as marketing and relationship development of large corporate risks and middle-market property accounts in the Corporate Solutions, North America Property, Eastern Region." (456). Servicing these new and existing accounts required extensive travel. (1773).

When not traveling, Graziano primarily worked sitting at a computer. (1011; 1388-89). This work required extended periods of sitting, frequent fingering and keyboard use, phone use, and using special data and computer systems. (1011, 1388-90, 1718, 1734). The remainder of his time was spent participating in meetings or at events, typically while standing. (1096, 1194).

Graziano's work was skilled[4] with high-level cognitive demands. (1718). His performance needed to be excellent as even one mistake could have profound consequences. (456, 1718, 1190-94). Graziano had to engage in highly complex analytical thinking, strategic problem solving, and planning. (*Id.*). He needed to sustain attention and concentration for extended durations. (*Id.*). The ability to maintain mental flexibility and multitask at a high level also was critical, particularly as he had to supervise and lead others. (456, 1718, 1190-94).

The cognitive demands of Graziano's work included:

Attaining Precise Set Limits, Tolerances, and Standards: Involves adhering to and achieving exact levels of performance, using precision measuring instruments, tools, and machines to attain precise dimensions; preparing exact verbal and numerical records; and complying with precise instruments and specifications for material, methods, procedures, and techniques to attain specified standards.

Dealing with People: Involves interpersonal relationships in job situations beyond receiving work instructions.

Making Judgments and Decisions: Involves solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or quantifiable or factual data. (1718).

The job also required long hours due to required business travel and client engagement demands. (1093, 1094, 1773). Graziano completed approximately one hundred client visits per year. (1094, 1289, 1773).

**2017 NYC Subway Station Injury**

In late 2017, while going through a subway turnstile on his way home from work, Graziano's bag – laden with a heavy laptop and papers – slipped from his shoulder and fell to the ground. (1090-91). This sudden weight shift caused him to sharply twist his lower back. (1090-91). Graziano was immobilized by the resulting pain and remained on the ground for over half an hour. (*Id.*). Ultimately, he was able to gingerly get up and slowly make his way home from Manhattan to West Islip, crawling

---

[4] Skilled work requires "2-4 years of education, training and experience." (1718).

at times, suffering from excruciating flares of pain with movement. (*Id.*). Graziano worked from home the rest of the week and began to work from home with increasing frequency thereafter. *(Id.)*.

**Symptom Progression Resulting in Declining Performance**

Graziano's lower back pain progressively worsened after his 2017 injury. (1090-91). He also began to experience increasing bilateral shoulder pain. (1092). Over time, these symptoms increased in severity, and he developed worsening extremity weakness, decreased range of motion, altered reflexes, and positional intolerances relating to his back and lower extremities. (1088-94). These worsening symptoms began to interfere with his occupational demands. (1088-94). Throughout 2018, it was increasingly difficult to continuously sit, stand/walk, type, travel, and complete a normal workday/workweek. (1088-94). Graziano was frequently forced to work from home due to his symptoms, resulting in lost clients and failure to sign new clients. (1088-94). Graziano's annual performance bonuses decreased from $60,000 in 2014 to no earned bonuses in 2017 or 2018. (1189).

Colleagues noticed Graziano's declining performance. (1289). His team leader recommended he adhere to the same schedule as other team members – four days in the office and one at home. (1289-90). Graziano was unable to meet this requirement due to his worsening condition. (*Id.*).

On September 25, 2018, Graziano received a poor mid-year review which stated he needed to step up his performance and productivity. (1385). It indicated Graziano's year-to-date productivity included only 20 submissions, 2 quotes, no new business, and 4 lost accounts. (*Id.*). Although the report acknowledged two upcoming doctor appointments for his back pain, it also detailed expectations for the amount of time Graziano should spend in the office going forward. (1385).

At the end of September 2018, Graziano traveled to Chicago for a three-day seminar with clients. (1290). Graziano suffered extreme pain due to the air travel, hotel stay, and long meetings on this trip. (*Id.*). He began canceling client meetings. (*Id.*). In October, Graziano's symptoms were so

bad that he was forced to forgo a major event at a Manhattan restaurant that he himself had organized for over 35 clients and department co-workers.  (1291).

## Graziano Reached a Tipping Point on October 16, 2018

On October 16, 2018, Dr. Jeffry Beer[5] examined Graziano and recommended he remain out of work until further notice.  (265).  Dr. Beer explained that Graziano's lumbar pain, limited lumbar range of motion, and inability to perform prolonged sitting, standing, and walking rendered him "unable to physically perform his normal duties as Vice President/Senior Production Underwriter."  (*Id.*).

## Unum Approved Graziano's Claims, Effective October 16, 2018

Graziano applied for LTD and waiver of premium benefits on February 27, 2019 (109, 515-30).  On March 20, 2019, Unum approved Graziano's claim for LTD benefits finding he was "unable to perform the material and substantial duties of [his] regular occupation" since his date of disability on October, 16 2018.  (466-70).  The LTD benefits became payable on April 16, 2019.  (466).  On March 28, 2019, Unum also approved Graziano's claim for waiver of premium benefits, finding he was "unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience."  (LWOP-223-26).

## Unum Terminated Graziano's Benefits Effective January 2, 2020

Unum paid Graziano benefits from April 16, 2019 through January 2, 2020.  (466, 834).  On January 2, 2020, Unum terminated his benefits without presenting any examination evidence, diagnostic testing, clinical findings, or surveillance.  (834-40).  Unum's abrupt termination was based solely on the opinions of Unum's non-examining paper review physicians.  (*Id.*).

---

[5] Dr. Beer is a board-certified Physical Medicine and Rehabilitation and Pain Management specialist who has treated Graziano since 2015.  (1626).

On June 30, 2020, Graziano appealed – submitting ample medical and vocational evidence supporting his ongoing disability. (904-1695). On November 10, 2020, in its final determination, Unum rejected the wall of evidence supporting Graziano's disability and, instead, stated that no benefits were payable because Graziano's condition was stable and non-severe. (1847-58).

**Graziano's Disability is Supported by Evidence in the Record**

Contrary to Unum's determination, Graziano's ongoing disability is supported by: (a) the fully favorable decision of the Social Security Administrative Law Judge ("ALJ") Alexander Levine; (b) Graziano's treating physician, Dr. Beer; (c) abnormal diagnostic testing; (d) the 2020 and 2018 Functional Capacity Evaluations; and (e) the May 5, 2020 Vocational Assessment and August 20, 2020 addendum. (*See infra,* p. 10). All of this evidence is corroborative and consistent.

ALJ Decision: Graziano's disability is supported and corroborated by the factual findings and conclusions of Social Security ALJ Levine. (*See* Ex. 1). After conducting a fact-finding hearing with live testimony, ALJ Levine found Graziano disabled from his own occupation and any other occupation since October 15, 2018. (*Id.*). ALJ Levine concluded Graziano lacks the residual functional capacity to perform even full-time sedentary work, let alone light work, and that he is unable to perform the physical demands of his past relevant work as an Underwriter (DOT 169.267-046, SVP 7, sedentary). (*Id.*).

Treating Physician Dr. Beer: Graziano's long time treating spinal and pain management specialist, Dr. Jeffry Beer, has consistently stated that Graziano is disabled since October 16, 2018. (159, 160-73, 346-47, 658-63, 747-49). Dr. Beer is board-certified in Physical Medicine and Rehabilitation and Pain Management and is board-eligible in Electrodiagnostic and Neuromuscular Medicine. (1833). He currently serves as Clinical Assistant Professor at Hofstra University School of Medicine. (*Id.*).

<u>Abnormal MRIs and X-Rays</u>:  Graziano's abnormal diagnostic test results support his claimed restrictions and limitations, including abnormal lumbar MRIs on September 10, 2020 (1788-89) and October 6, 2017 (285-86), an abnormal left hip MRI on September 10, 2020 (1790), an abnormal shoulder MRI on December 12, 2018 (368), and abnormal shoulder x-rays on January 14, 2019.  (428).

<u>Functional Capacity Evaluations</u>:  Graziano's disability is supported by two objective Functional Capacity Evaluations ("FCE").[6]  The FCEs were each performed over two days by Susan Greenberg, MS, PT ("PT Greenberg") on January 28 and 29, 2020 ("the 2020 FCE") (961-96) and on October 11 and 12, 2018 (the "2018 FCE").  (233-62).  Each result was confirmed by embedded validity and consistency testing.[7]  (237-41, 966-70).  The 2018 FCE and 2020 FCE are consistent with and corroborate each other.[8]  (233-62, 961-96).  Dr. Beer concluded the 2018 and 2020 FCE results also were "consistent with my findings and evaluations of [Graziano]" as well as the diagnostic testing. (358, 1776-77).  After both the 2018 FCE and the 2020 FCE, PT Greenberg concluded that "Graziano is unable to perform his former occupation of Senior Underwriter for Swiss Re due to the large

---

[6] A "functional capacity evaluation is generally a reliable and objective method of gauging the extent one can complete work-related tasks."  *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (quotation marks and citations omitted); *see also Barbu v Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 291 (E.D.N.Y. 2014]) ("the treating providers' opinions are compatible with the weight of the evidence because they were confirmed by the <u>objective data produced by the FCE</u>") (emphasis added).  *See also Chicco v. First Unum Life Ins. Co.*, 2022 U.S. Dist. LEXIS 37946, at *3 (S.D.N.Y. Mar. 3, 2022) (crediting an FCE as objective evidence of pain, weakness, and fatigue).

[7] The results of both two-day sets of tests were valid.  Graziano met all ten of the applicable "consistency checkpoints" that were built into both the 2018 and the 2020 testing. (237-41, 966-70). As the reports state, "three or more inconsistencies may indicate lack of consistent effort." (238, 967). None of Graziano's results were inconsistent, indicating that the results of the testing were valid and not marked by malingering or lack of effort. (237-41, 966-70).  Graziano was notably limited by his disability and manifestation of his physical limitations in tasks such as walking, sitting, standing, and hand coordination, fine/gross and dexterity skill tests for the bilateral hands. (237-41, 246-49).

[8] The 2020 FCE contains comparisons to the 2018 FCE. (975-79).  The results are broadly consistent, but in some areas, Graziano's abilities decreased.  For example, Graziano's left hand gross motor skills decreased 22% and his left-hand motor skills decreased 8.3%. (975).

discrepancy between his current functional abilities and the critical/essential job demands of his previous job. . . . He remains totally disabled from his occupation at this time." (252, 986-87).

Vocational Evaluations: The May 5, 2020 assessment and August 20, 2020 addendum by vocational expert Amy Leopold, MS, CRC support Graziano's disability. (1374-92, 1772-75). Vocational Expert Leopold concluded Graziano's residual functional capacity precludes performance of his regular occupation and any other occupation "commensurate with his training, education, and experience." (1392). This conclusion is based on her extensive review of the medical records, occupational requirements, job description, performance review, and Unum's medical and vocational reviews. (1374-92, 1772-75).

Vocational Expert Leopold concluded that Graziano's occupation most closely aligns with the Dictionary of Occupational Titles[9] ("DOT") listing for "Underwriter" DOT 169.267.046 and "Insurance Underwriter" O*NET #13-2053.00. (1190-94). Vocational Expert Leopold concluded Graziano's travel duties required a capacity to perform work at the light exertion level, as defined in the DOT.[10] (1386, 1773).

Graziano's medical and vocational evidence is consistent and corroborative. The evidence demonstrates that Graziano is unable to meet the demands of his regular occupation in five ways: (a) Graziano cannot meet the sitting requirements; (b) Graziano cannot meet the keyboarding requirements; (c) Graziano cannot complete a normal workday or workweek; (d) Graziano cannot

---

[9] The DOT is published by the U.S. Department of Labor. The DOT "groups jobs based on their similarities and defines the structure and content of all listed occupations." *See* Dictionary of Occupational Titles (DOT): Revised Fourth Edition, 1991, https://www.dol.gov/ agencies/oalj/topics/libraries/LIBDOT.

[10] The DOT classifies occupations in various ways, including strength classifications. The DOT provides for five strength classifications: sedentary, light, medium, heavy and very heavy. A job is classified as light work when it requires walking or standing to a significant degree. *Zappier v. Sun Life Assur. Co.*, 2006 U.S. Dist. LEXIS 68537, at *25-26 (S.D.N.Y. Aug. 10, 2006) (remanding to Sun Life in part because of a benefits analyst's misstatement regarding "light work").

meet the high-level cognitive demands; and (e) Graziano cannot meet the business travel requirements. *See infra* Section II.A.  The failure to satisfy even one of these duties is disabling, but the combined impact of each limitation should be considered.

## ARGUMENT

Judgment should be granted in favor of Graziano.  For the reasons detailed below: (I) the Court should overturn the termination of Graziano's benefits because Unum denied Graziano a full and fair review; (II) a preponderance of the evidence demonstrates that Graziano is disabled under the standard set forth in the plans; and (III) as a remedy, the Court should reinstate Graziano's benefits, or, in the alternative, remand Graziano's claim back to Unum for additional development of the record.

## I.    THE COURT SHOULD OVERTURN THE TERMINATION OF GRAZIANO'S BENEFITS BECAUSE UNUM DENIED GRAZIANO A FULL AND FAIR REVIEW

An administrator's determination must be overturned when the administrator denies a claimant a full and fair review under ERISA § 503 (29 U.S.C. § 1133), and the Department of Labor regulations issued thereunder, 29 C.F.R. § 2560.503-1 (2018).  *See Cook v. N.Y. Times Co., Group Long Term Disability Plan*, 2004 U.S. Dist. LEXIS 1259, *57-58 (S.D.N.Y. Jan. 27, 2004) (Lynch, G.).

Here, Unum denied Graziano a full and fair review when it failed to consult with a health care professional to review evidence that Graziano submitted on appeal.

29 C.F.R. § 2560.503-1(h)(3)(iii) requires an "appropriate named fiduciary," such as Unum, to "consult" with an appropriate "health care professional," when deciding an appeal of an adverse benefit determination that is "based in whole or in part on a medical judgment."  The regulation provides:

> [I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with

a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

Unum violated 29 C.F.R. § 2560.503-1(h)(3)(iii) when it rejected the records from Generations Physical Therapy (1837-42) and the most recent opinion of Dr. Beer, dated October 29, 2020 (1835-36), without first consulting with an appropriate health care professional.  Graziano submitted these new records to Unum on November 2, 2020 in response to Dr. Norris' October 12, 2020 appeal report.  (1833-42, 1801-03).  Even though rejecting these records necessitated a medical judgment, Unum rejected these records based solely on the lay opinion of its non-medical appeals specialist and never submitted these records for review by Dr. Norris or any other health care professional.[11]  There is no "consultation" without the seeking and giving of advice, and none was sought or given here.

Unum's failure is significant because the new records contradict and undermine the conclusions of Dr. Norris' October 12, 2020 Report, the backbone of Unum's denial.

*First*, in his October 12, 2020 Report, Dr. Norris refused to credit the severity of Graziano's pain and functional impairment based on the conclusion that Graziano did not undergo physical therapy, as recommended by his providers.[12]  But, as the notes of Generations Physical Therapy clearly demonstrate, Graziano did go to physical therapy.  Unum was obligated to consult with Dr. Norris or another health care professional to see if these notes require reversal of Dr. Norris' conclusion about the severity of Graziano's pain and functional impairment.

---

[11] Unum's final adverse determination notice (1847-58), which mentions this evidence, cannot save Unum.  A review by Unum's non-medical appeals specialist, Katie Doherty, who does not have "appropriate training and experience in the field of medicine in involved in the medical judgment" cannot satisfy the dictates of 29 C.F.R. § 2560.503-1(h)(3)(iii).

[12] Dr. Norris stated that "[a]lthough referred to PT [physical therapy] on at least three additional occasions (Aug and Sep 2020), records do not indicate that [Graziano] pursued therapy.  If severe, refractory, and progressive pain and functional impairment were ongoing, compliance with PT [physical therapy] would be expected."  (1803).

**Second**, Dr. Norris refused to credit Graziano's FCE results, on the ground that "recent examinations in Aug/Sep 2020 described normal upper/lower extremity strength, which showed ongoing inconsistency with the Feb 2020 FCE description[.]" (1803). But, the Generations Physical Therapy notes document testing that contradict Dr. Norris' conclusion. The notes document positive "Empty Can" tests for both rotator cuffs the following month, in October 2020. (1838). The "Empty Can" test is considered positive if there is weakness, pain or both during resistance. A positive test implies supraspinatus tendon, muscle injury/tears, or other pathological neuropathies (such as inflammation of the suprascapular nerve).[13] Unum was obligated to consult with Dr. Norris or another health care professional to see if the results of the Empty Can tests require reversal of Dr. Norris' conclusions.

**Third**, Dr. Beer's rebuttal report directly contradicted and/or challenged numerous conclusions made by Dr. Norris in his October 12, 2020 report. Unum was obligated to consult with Dr. Norris or another health care professional before rejecting the relevance of Dr. Beer's rebuttal report. For instance, Dr. Beer wrote, "Dr. Norris' failure to comment on or address **any** restrictions or limitations related to the lumbar spinal conditions, including Graziano's limited capacity for sitting, is more than an oversight." (1835) (emphasis in original). Dr. Beer's admonition was in response to Dr. Norris' statement that "[t]he medical evidence does not support [restrictions or limitations] that would have precluded the insured from performing full time sedentary occupational activities." (1734). Dr. Beer provided many restrictions, including that "Graziano cannot sustain prolonged sitting, standing or static positioning." (1835). Dr. Beer also stated that Graziano "requires frequent breaks with activity and the option to change positions or lie down and rest as needed. (*Id*). "In a work

---

[13] Mirco Sgroi, M.D. et al., Diagnostic Value of Clinical Tests for Supraspinatus Tendon Tears, 34 Arthroscopy: The Journal of Arthroscopic & Related Surgery, Iss. 8, 2326-2333 (Aug. 2018), https://doi.org/10.1016/j.arthro.2018.03.030.

setting he would be off task a greater percentage of the time that [sic] is acceptable to employers." (*Id.*).  Graziano "would be off task at least 20% during normal workday."  (*Id.*).  Dr. Norris did not provide any opinion regarding Graziano's ability to remain on task.  (1730-35).  Dr. Beer found that Graziano's "restrictions are consistent with the diagnoses, diagnostic testing results, objective findings, Functional Capacity Evaluation results in Mr. Graziano's severe symptoms." (1835).  Unum was obligated to have a medical professional determine if this evidence required reversal of Dr. Norris' inconsistent and incomplete conclusions.

II.    **A PREPONDERANCE OF THE EVIDENCE DEMONSTRATES THAT GRAZIANO IS DISABLED UNDER THE STANDARDS SET FORTH IN THE PLANS**

The Court should grant judgment to Graziano because: (A) Graziano's evidence establishes entitlement to benefits under the standards set forth in the Plans; and (B) Unum's evidence is insufficient to rebut Graziano's evidence.

A.    **Graziano's Evidence Establishes Entitlement to Benefits Under the Standards Set Forth in the Plans**

Plaintiffs under a *de novo* review[14] must establish the elements of their case by a preponderance of the evidence.  *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). "Preponderance is not a terribly demanding standard." *Vineyard Vines, LLC v. MacBeth Collection*, LLC, 2018 U.S. Dist. LEXIS 205502, at *17 (D. Conn. Dec. 5, 2018).  "[A] fact has been proven by a preponderance of the evidence if it finds that the scales tip, however slightly, in favor of the party with the burden of proof as to that fact." *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) (citations and quotation marks omitted).

---

[14] *De novo* standard applies because the Plan does not grant discretionary authority to Unum.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1988).

In a *de novo* review, no deference is given to the insurer's interpretation of the plan, analysis of the medical record, or conclusions as to the merits of the benefits claim. *McDonnell v. First Unum Life Ins. Co.*, 2013 U.S. Dist. LEXIS 110361, at *38 (S.D.N.Y. Aug. 5, 2013). Rather, the Court "stands in the shoes of the original decisionmaker." *Id.* The Court "interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion." *Id.* (citations omitted); *see also Tretola v. First Unum Life Ins. Co.*, 2015 U.S. Dist. LEXIS 14666, at *58 (S.D.N.Y. Feb. 6, 2015).

To establish disability and entitlement to ongoing LTD benefits beyond January 2, 2020, Graziano must demonstrate by a preponderance of the evidence that he remained limited from performing the material and substantial duties of his "regular occupation" (391) as a senior underwriter for an international reinsurance company. [15] (618).

A claimant can be totally disabled under this standard even if he can perform some of the duties on a full-time basis. *Shapiro v. Berkshire Life Ins. Co.*, 1999 U.S. Dist. LEXIS 11789, *10 (S.D.N.Y.

---

[15] At the onset of Graziano's claim and at the time of Unum's benefit termination, he need only demonstrate disability from his regular occupation. After benefits are payable for 24 months (*e.g.*, April 21, 2021), the burden rises – he must demonstrate that he is unable to perform any gainful occupation for which he is reasonably qualified and would provide an income of at least 60% of Graziano's indexed monthly earnings if he is not working. (Ex. 5, p. 30). His indexed total monthly earnings are $12,750. (451). Because Unum terminated benefits <u>before</u> April 16, 2021 (the 24-month mark), Graziano never had the opportunity to submit updated medical evidence relevant to the altered standard at 24-months. Should the Court remand the claim for further consideration as to future LTD benefits, it should specify that Graziano will be provided the opportunity to perfect his claim under the altered standard.

For Graziano's life waiver of premium claim (*see* Compl., ECF, No. 1, Count II), he must demonstrate disability according to the same "any gainful occupation" standard as the LTD claim at the 24-month mark. (Ex. 5, pp. 34-35).

Unum found that Graziano satisfied both standards, as of October 16, 2018 (466-70, LWOP-223-26), only to erroneously reverse course and terminate LTD and life waiver of premium benefits effective January 2 and 3, 2020, respectively. (834-40, LWOP-300-04). The evidence detailed below is sufficient to support disability beyond January 2, 2020 under both the LTD and Life Plans. But, these claims are independent and could be bifurcated, accordingly.

Aug. 3, 1999), *aff'd*, 212 F.3d 121 (2d Cir. 2000) ("Total disability in particular occupations occurs when the insured is found to be incapacitated from performing *any substantial part* of his ordinary duties, notwithstanding that he can still perform some of the duties pertinent to his profession.") (emphasis added). "The materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes and its qualitative importance to the professional mission." *Lasser v. Reliance Std. Life Ins. Co.*, 146 F. Supp. 2d 619, 636 (D.N.J. 2001), *aff'd*, 344 F.3d 381 (3d Cir. 2003). "A duty is 'material' when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation.'" (*Id.*).

If just one material and substantial function cannot be performed, then Graziano cannot perform his work as a whole. As the Seventh Circuit explained in *McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998), the analysis requires consideration of both "qualitative" and "quantitative" reductions in an individual's ability to perform the material duties of his occupation. *Id.* at 588.

A "qualitative reduction" is one where the claimant is unable to perform even "one core and essential aspect" of one's job – e.g., a baseball shortstop losing the ability to throw. *Id.* A "quantitative reduction," on the other hand, is when the injury or sickness does not "physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." *Id.* Thus, disability exists even where "the person is still able to perform the actual tasks themselves, [but] the person is reduced to perhaps to 25% of the prior output." *Id.*; *see also Lockhart v. Jefferson Pilot Fin. Ins. Co.*, 2009 U.S. Dist. LEXIS 26809, at *45 (N.D. Ill. Mar. 31, 2009) ("[E]ven if Plaintiff's hands can *literally* grasp a telephone, but doing so would exhaust her or cause her pain, then she cannot be said to be able to *functionally* perform that task.") (emphasis in original).

16

A preponderance of the evidence shows that Graziano's impairments continued to impose both qualitative and quantitative limitations on his ability to perform his regular occupation as a senior underwriter at an international reinsurance company as of January 2, 2020, and, as such he satisfies the LTD Plan's standard for disability.

Indeed, the Social Security Administration (the "SSA") has already determined that Graziano is so disabled that he satisfies a standard of disability that is significantly harder to satisfy than the regular occupation standard specified in the LTD Plan. An administrative law judge of the SSA found that Graziano is "unable to perform any past relevant work" (Ex. 1, p. 2), and that his "acquired job skills do not transfer to other occupations within [his] residual functional capacity." (*Id.*, p. 3). For this reason, he "has been under a disability as defined in the Social Security Act since October 15, 2018." (*Id.*).[16] This determination reflects the SSA's determination that Graziano cannot perform

---

[16] If Unum were to disagree with the SSA decision in an adverse benefit determination, it would be required to include an "explanation of the basis for disagreeing with or not following" the decision. 29 C.F.R. § 503-1(g)(vii)(A)(iii). Even outside of the DOL Regulations, because of Unum's prior bad conduct, Unum is required to give significant weight to this determination by a Regulatory Settlement Agreement ("RSA"). Unum was forced to enter into the RSA with the U.S. Department of Labor and state insurance regulators from 48 states – promising to change its claims handling procedures and reassess thousands of claims. Under the RSA, Unum is required to

> give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.

*Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 473 (E.D. Pa 2021). This "significant weight" standard is incorporated into Unum's claims manual, produced in this litigation. (*See* Ex. 2, The Benefits Center Claims Manual, Social Security Significant Weight).

substantial gainful activity – that is, activity that could generate $1,220 per month in 2019, $1,260 in 2020, $1,310 in 2021, and $1,350 in 2022.[17]

As explained in detail below, the evidence establishes that as of January 2, 2020, Graziano cannot meet five (5) material and substantial duties of his regular occupation as a senior underwriter at an international reinsurance company.  Specifically: (1) Graziano cannot perform the sitting requirements; (2) Graziano cannot perform the keyboarding requirements; (3) Graziano cannot complete a normal work schedule on a consistent, reliable, and sustained basis; (4) Graziano cannot meet the high-level cognitive demands; and (5) Graziano cannot meet the frequent travel requirements.  An inability to perform any one of these duties is sufficient to establish disability, but the combined impact should be considered.

    1.  <u>Graziano Cannot Perform the Sitting Requirements</u>

Graziano could not and cannot perform the prolonged sitting necessary to perform his duties.  Graziano's occupation required him to sit for most of an 8-hour day,[18] but he only could sit from 6% to 33% (approximately 30 minutes to 2.67 hours) of an 8-hour day due to impairments of his lumbar spine and hip.

Graziano cannot meet the sitting requirements for both travel and desk work due to: severe low back pain (967, 1141-62, 1678-82); muscle spasms (1140-62); tenderness to palpation (564. 796); decreased range of motion (265, 268, 358, 405, 662, 967, 984-87, 995-99, 1141-62); weakness (248,

---

[17] Substantial Gainful Activity, Social Security Administration, https://www.ssa.gov/oact/cola/sga.html.

[18] When not traveling, Graziano's work as a senior underwriter required a significant amount of sitting at his computer desk.  (456, 1193-95).  According to Unum's vocational consultant, his occupation is identified as Underwriter Commercial Property (eDOT[18] 169.267-200) (1818) – a "sedentary" occupation that is performed "mostly sitting," with the option to change positions for only brief periods.  (1817).

966-68, 995-99, 1141-64); diminished stamina (984-87); inability to tolerate prolonged sitting (265, 358, 405, 984-85, 1835); and fatigue (248, 1156-60, 1680-84, 1772-75).

Graziano's inability to perform these requirements is demonstrated by: (a) Dr. Jeffry Beer's assessment, (b) repeat functional capacity evaluations, (c) abnormal diagnostic tests, (d) Graziano's consistently documented pain, (e) Vocational Expert Leopold, and (f) the Social Security Decision.

*Dr. Jeffry Beer's Assessment*:[19]  Graziano's long time treating spinal and pain management specialist, Dr. Jeffry Beer, has consistently opined that Graziano only can sit 20 to 25 minutes or less at one time ("he must change positions frequently"), disabling him from his occupation.  (358, 1680-84; 1849).  Dr. Beer diagnosed Graziano with chronic lower back pain, multilevel degenerative disc disease, facet joint arthropathy, and disc bulging with nerve compression.  (1835).  Dr. Beer confirmed Graziano has undergone extensive treatment, including medial branch injections, epidural steroid injection, lumbar radiofrequency ablation treatments, physical therapy, and medications – all of which failed to provide significant, lasting pain relief.  (346, 405).  Dr. Beer confirmed Graziano continues to experience daily fatigue, severe low back pain, decreased lumbar range of motion, generalized weakness, and cognitive symptoms despite these treatments.  (358, 405, 1772-75, 1835-36, 1845).  These symptoms are exacerbated by weather changes, deep breathing, stress, overuse, cold temperatures, and static positions, and prolonged sitting, standing, and walking.  (997-1001).  Due to these deficits, Dr. Beer has consistently supported Graziano's ongoing disability since October 16, 2018.  (159, 160-73, 265-79, 346, 658-63, 670-675, 747-49).

*The Repeat Functional Capacity Evaluations*:  The repeat FCEs (performed in 2018 and again in 2020) establish significant physical abnormalities relating to Graziano's lumbar spine and hip, causing

---

[19] Dr. Beer offers a valuable perspective as to Graziano's limitations.  Afterall, he is the <u>only</u> opining physician who examined and observed Graziano in-person, and he did so both before and after Unum terminated benefits effective January 2, 2020.  (265, 358, 405, 819, 1835-36).

persistent positional intolerances and functional limitations in sitting. (237-41, 246-49, 251-52, 254-256, 258-61, 964-69, 980-83, 985-987, 989, 991-94, *see supra*, pp. 9-10).[20] Both FCEs concluded that Graziano is incapable of meeting the sitting demands of his regular occupation as a senior underwriter, as he can only sit for 6% to 33% of an 8-hour workday. (251-52, 985-87, 996). According to the 2020 FCE, "Sitting tolerance was poor and consistent throughout all of the FCE subtests . . . . He was noted to be physically agitated in the sitting position and very frequently stood up to change positions. This intolerance worsened as the test progressed." (969). The 2018 FCE stated, "Positional tolerance tasks, especially sitting and standing, as well as sitting and standing with forward bending or trunk rotation were limited by pain in the lower back caused by muscle tightness, trunk weakness, and poor core and scapula stabilization." (246). Graziano "needed to change positions very frequently, especially from sitting to standing due to intolerance of the sitting position, increased lower back pain and fatigue, which became increasingly more intense and difficulty to tolerate as the test progressed." (247).

*Abnormal Diagnostic Tests*: The objective medical evidence establishes significant physical abnormalities of Graziano's lumbar spine and hip that impair his ability to sit. (160-180, 186-88, 206-07, 209, 211, 267-71, 348-49, 658-63, 670-74, 747-48, 770, 911-912, 1776-77, *see supra*, pp. 20-21). This

---

[20] For example, easy fatigability and poor musculoskeletal endurance were noted throughout both reports (247, 249, 252, 981, 983, 985-87), as well as a significant positional intolerance that requires Graziano to change positions frequently (every 25 minutes). (252, 987). Graziano's ability to sit for prolonged periods was limited by his decreased core stabilization, trunk and paraspinal weakness, spinal stiffness, fatigue, deterioration of movements with increased activity, poor musculoskeletal endurance, and sacroiliac joint dysfunction. (980-83). PT Greenberg stated, "Sitting tolerance was poor and consistent throughout all of the FCE subtests and history/musculoskeletal assessments. Graziano exhibited increased spinal stiffness and increased low back pain significantly affecting his sitting tolerance." PT Greenberg observed Graziano to be "physically agitated in the sitting position and very frequently stood up to change positions. This intolerance worsened as the test progressed." (969, 1146). Based on the results, PT Greenberg concluded that Graziano "cannot sit more than occasionally" and would require changes of position with increasing frequency throughout the day. (986-87).

objective medical evidence includes: (i) the repeat abnormal MRIs of the lumbar spine[21]; (ii) the abnormal MRI of the hip; and (iii) many abnormal clinical findings upon physical examination.[22]

*Abnormal Lumbar MRIs*:  On September 10, 2020, Graziano submitted to a lumbar MRI with abnormal findings, including:

- *At L2-3*: A bulging disc and large central to left disc herniation – a protruding of the soft disc – moderately narrows the central spinal canal and left lateral recess.  This narrowing compresses the descending left-sided nerve roots.  In addition, the openings that allow nerves to branch from the spinal cord to the extremities are mildly narrowed on both sides. (1788-89).

- *At L3-4*:  A bulging bone spur, slightly to the left, indents the cover to the spinal cord, which results in a moderate narrowing of the opening that allows nerves to branch out from the spinal cord.  (*Id.*).

- *At L4-5*:  A bulging disc and broad-based disc herniation – a protruding of the soft disc – which indents the cover to the spinal cord and mildly narrows the left lateral recess.  The facet joint between the two bones of the spine is inflamed, which contributes to a mild narrowing of the opening that allows nerves to branch out of the spinal cord.  (*Id.*).

- *At L5-S1*:  A diffuse disc bulge indents the epidural fat, and the facet joint between the two bones is inflamed, both of which contribute to a mild narrowing of the opening that allows nerves to branch out of the spinal cord.  (*Id.*).

The 2020 lumbar MRI demonstrated a deterioration from Graziano's October 6, 2017 lumbar MRI which found:

- *At L2-3*: Diffuse bulging disc and large central to left disc herniation – a protruding of the soft disc – moderately narrows the central spinal canal and left lateral recess.  This narrowing compresses the descending left-sided nerve roots.  In addition, the opening that

---

[21] The 2020 lumbar MRI demonstrates worsening of Graziano's condition, when compared to the 2017 MRI.  For example, stenosis was present at four (4) levels on the 2020 MRI (L2-L3, L3-4, L4-5, and L5-S1), whereas the 2017 MRI only revealed stenosis at one level, L2-L3 (*see supra*, pp. 37-38).

[22] In relevant part, these abnormal clinical findings include:  (a) severe low back pain (234-37, 248, 268, 662, 998, 1146-47, 1681; 1774-75); (b) muscle spasms (237, 1146, 1689); (c) tenderness to palpation (796); (d) decreased spinal range of motion (268, 405, 662, 967, 1143-46, 1776-77); (e) weakness (719, 966, 1680); (f) diminished physical stamina (1143); (g) inability to tolerate prolonged sitting (265, 358, 984-85, 997, 1146, 1162, 1679, 1682, 1774-75,1835); (h) trunk weakness (248, 967, 995-97, 980, 1143, 1145, 1157, 1170); and (i) fatigue (248, 968, 997-99, 1145-47, 1160, 1680).

allow nerves to branch from the spinal cord to the extremities is mildly narrowed on the left. (954).

- *At L3-4*: Mild asymmetric to left bulging disc, and a bulging protrusion on the left. Minimal narrowing of the opening that allows nerves to branch out from the spinal cord. (*Id.*).

- *At L4-5*: Diffuse bulging disc and central disc protrusion. The facet joint between the two bones of the spine is inflamed, which contributes to a mild narrowing of the opening that allows nerves to branch out of the spinal cord. (*Id.*).

- *At L5-S1*: A diffuse disc bulge and a central disc protrusion. The facet joint between the two bones is inflamed. There is a mild narrowing of the opening that allows nerves to branch out of the spinal cord. (*Id.*).

*Abnormal Left Hip MRI*: On September 10, 2020 MRI of the left hip found tendinosis – degeneration of the tendon's collagen – and a low-grade partial tear of the left common hamstrings tendon. (1790).

*Graziano's Consistently Documented Pain*: Graziano's complaints of pain are supported by the clinical findings of his examining doctors: Dr. Beer; Dr. James Marzec;[23] Dr. Steven Rokito;[24] Dr. Sidney Stein;[25] and Dr. Weymin Hago,[26] as well as his physical therapists. For example:

- Dr. Beer consistently documented symmetrically reduced bilateral Achilles reflexes, moderate to severely limited lumbar range of motion, and positive bilateral lumbar facet load tests. (169, 172, 272, 662, 671, 748, 1198-2000, 1504, 1776).

---

[23] Dr. Marzec, has treated Graziano since 2018. (412). Dr. Marzec is a board-certified orthopedic surgeon specializing in Sports Medicine. He is also the Team Physician for the Harlem Globe Trotter East Coast Team and Orthopedic Consultant to the New York Lizard Major League Lacrosse team.

[24] Dr. Rokito is board-certified in orthopedic surgery and sports medicine. He is the Division Chief of Sports Medicine at the LIJ Medical Center Department of Orthopedic Surgery. He is an Assistant Professor at the Donald and Barbara Zucker School of Medicine. Dr. Rokito has been a New York Islanders associate team orthopedist for 10 years and the Long Island Ducks' head team physician for 20 years.

[25] Dr. Stein began treating Graziano in 2018. Dr. Stein is board-certified in internal medicine and the National Board of Medical Examiners. He serves as the Assistant Attending Physician at New York Presbyterian Hospital and Assistant Professor of Clinical Medicine at Weill Cornell Medical College.

[26] Dr. Hago is board-certified in internal medicine, specializing in preventative medicine and treatment of diabetes, sleep disorders, and hypertension.

- Dr. Marzec documented atrophy of the right deltoid muscle (412); "R[ight] l[ow] back spasm" and "Tender R[ight] SI joint" (1783-84); and marked loss of bilateral shoulder active range of motion. (1781).

- Dr. Stein documented focal pain in the lumbar spine with bilateral rotation and with right lateral flexion. (312).

- Dr. Rokito documented decreased cervical range of motion; decreased bilateral shoulder range of motion; and decreased bilateral shoulder strength. (407-08).

- Dr. Hago documented decreased lumbar forward flexion. (918).

- Kathleen Febos, PT documented decreased bilateral shoulder range of motion, decreased bilateral shoulder strength, severely limited lumbar range of motion, positive bilateral straight leg raise test, and positive lumbar spring tests. (595-96, *see also* 562-85, 1837-39).

_The Assessment of Vocational Expert Leopold_: Vocational Expert Leopold concluded that Graziano "is incapable of performing the duties of any profession requiring extended time sitting…" (910). Graziano "experiences significant and debilitating limitations in his ability to sit, stand, and walk" (1796) and "is not able to tolerate an 8-hour workday due to positional intolerances in sitting and standing (must change positions every 20 to 25 minutes), increased fatigue, deterioration of movements as tasks progress, and poor musculoskeletal endurance." (1796). Vocational Expert Leopold concluded that Graziano has less than a sedentary work capacity. (908, 1774, 1796).

_The Social Security Decision of ALJ Levine:_ ALJ Levine found that Graziano "is unable to perform any past relevant work" (Ex. 1, p. 2), "is limited to occasional posturals" (*id.*, p. 1), and "could only sit or stand for 30 minutes." (*Id.*, p. 2).

2. Graziano Cannot Performing the Keyboarding Requirements

Graziano's work required "frequent" keyboarding – 34% to 66% of an 8-hour day – in addition to frequent reaching, handling, and fingering at desk level. (1718). Indeed, when at his desk, Graziano spent a significant portion of his time keyboarding. (1012, 1389-90, 1498, 1712-14, 1733, 1750). But, the impairments of Graziano's upper extremities and limited use of his hands limit his keyboarding to only 5% to 15% of an 8-hour day. (242-44, 248, 251-52, 961-96). His inability to

frequently keyboard at a desk is further compounded by this inability to sit at a desk for more than 6% to 33% of an 8-hour workday.  (*See supra*, Section II.A.1).

Graziano could not and cannot meet the keyboarding requirements due to: poor gross motor skills (127-46, 248-51, 966, 1144-55, 1162-68); poor fine motor skills (127-46, 248-51, 966, 1144-55, 1162-68); decreased grip strength (127-46, 248-51, 966, 1144-55, 1162-68); decreased pinch strength (127-46, 966, 1144-55, 1162-68); decreased hand coordination (127-46, 966, 1143-55, 1162-68); decreased dexterity (127-46, 248-51, 1144-55, 1162-68); decreased bilateral shoulder range of motion (566-74, 966, 358, 557, 564, 1162-68, 1728); decreased bilateral shoulder strength (566-74, 966, 1162-68); bilateral shoulder stiffness (566-74, 1162-68); fatigue with exertion (248-51, 1164-68); and decreased musculoskeletal tolerance for activity with increased exertional demands or repetitive movements (233-52, 1162-64, 1836).

Graziano's inability to perform these requirements is demonstrated by (a) Dr. Jeffry Beer's assessment, (b) the functional capacity evaluations, (c) abnormal diagnostic tests, and (d) Vocational Expert Leopold.

*Dr. Jeffry Beer's assessment*: Dr. Beer has consistently stated that Graziano has significant limitations for repetitive reaching, handling, or fingering.  (1684).  He can use his bilateral hands/fingers/arms for a total of only 5% of an 8-hour workday to perform repetitive grasp, turn, twist, fine manipulation, and reaching activities.  (1684, 1730).

*The Repeat Functional Capacity Evaluations*:  The repeat FCEs established significant physical abnormalities relating to Graziano's upper extremities, including his bilateral shoulders[27] and hands,[28] which significantly impair his ability to perform frequent keyboarding.  (237-49, 251-52, 254, 258, 964-81, 983-87, 993; *see supra*, pp. 9-10).  Both FCEs (performed in 2018 and 2020) concluded that Graziano is incapable of meeting the keyboarding demands of his regular occupation as a senior underwriter, and other desk tasks requiring fine motor skills, dexterity, or grip.  (251, 985-87).  The 2020 FCE report specifically states that Graziano can only perform tasks requiring fine motor skills with his right hand 6% to 15% of day, and 34-66% of day with his left hand (996), and that these limitations preclude the demands of Graziano's occupation.  (985-87).

Both FCEs document that Graziano was well below average in gross motor skills, significantly below average to below average in fine motor skills, and well below average to below average in dexterity.  (1152).  Graziano had below average bilateral tip pinch grip, well below average bilateral palmar pinch grip, significantly below average bilateral key pinch grip, and below average bilateral

---

[27] Both the 2018 and 2020 FCE reports document notable muscular weakness in Graziano's bilateral shoulders, decreased range of motion, and bilateral shoulder pain.  (237-39, 246-49, 252, 254, 258-60, 964-68, 978-84, 986-87, 989-93).  Graziano demonstrated increased shoulder pain, as well as decreased core and scapula stabilization while performing the repetitive tasks of hand coordination testing and hand grip/pinch grip testing.  (249, 981).  This resulted in rapid fatigue, as well as the poor hand scores noted above.  (249, 981).

[28] The FCE reports state that Graziano has impaired gross/fine motor coordination and dexterity skills, as well as impaired pinch grip.  (242-45, 248-49, 251-52, 259-62, 969-76, 982, 986-88).  In comparing the 2018 FCE to the 2020 FCE, the reports demonstrate that Graziano's use of his upper extremities deteriorated.  Specifically, the 2020 FCE report documents that: fine motor skills were significantly below average to below average; dexterity was well below average to below average; bilateral tip pinch grip was below average; bilateral palmar pinch grip was well below average; bilateral key pinch grip was significantly below average; and bilateral Jamar grip was below average.  (1146-1150, 1153-56, 1366-1368).  These are impairments that not only prevent Graziano from meeting keyboarding demands, but also using other small items on his desk. (985-87).

Jamar grip (1148-1150, 1153-56, 1366-68).  The scores showed a further deterioration in upper extremity abilities from the 2018 FCE to the 2020 FCE (1152-56).

*Abnormal Diagnostic Tests*:  The objective medical evidence from Graziano's treating providers establishes significant physical abnormalities as to Graziano's upper extremities (including his bilateral shoulders), which impair his ability to keyboard.  (407-408, 412-414, 433-434, 557-590, 594-599, 1777-83, 1833-38, *see supra*, Section II.A.2).  The x-ray of his right shoulder[29] found moderate to advanced glenohumeral osteoarthritis – a degeneration of cartilage and bone, with a narrowing of the shoulder joint.  (428).  In addition, there is a large bone spur on the interior aspect of the humeral head.  (428).  His left shoulder x-ray found moderate glenohumeral osteoarthritis, and a bone spur on the inferior aspect of the humeral head.  (*Id.*).

Abnormal clinical findings upon examination include:  (a) poor gross motor skills (127-46, 251, 1152, 1163); (b) poor fine motor skills (248-51, 1152, 1163); (c) below average to significantly below average grip strength (248-49, 251, 259, 1150, 1154, 1163, 1366); (d) below average to significantly below average pinch strength (154, 248-49, 260, 995, 1172, 1367); (e) below average to significantly below average hand coordination (249, 1160); (f) decreased dexterity (136, 155, 1152); (g) decreased range of motion of the bilateral shoulders (557, 967, 1144, 1835-36); (h) decreased bilateral shoulder strength (248, 968, 1144); (i) bilateral shoulder stiffness (248, 566-570, 572, 574, 1147, 1157); (j) fatigue with exertion (248-49, 1682); and (k) decreased musculoskeletal tolerance for activity with increased exertional demands or repetitive movements (248-49, 557, 572, 1157, 1835-37); (l) pain (557, 564, 1835-37); (m) positive Empty Can test (1838); and (n) tenderness to palpation (564, 1802).

---

[29] Right shoulder imaging from 2018 and 2019 revealed "moderate" to "marked" or "advanced" findings of glenohumeral osteoarthritis, among other abnormalities (368, 428).  The more recent 2019 imaging also showed a new "large osteophyte projecting off the inferior aspect of [Graziano's] humeral head."  (428).

*The Vocational Assessment of Vocational Expert Leopold*:  Vocational Expert Leopold concluded that Graziano cannot perform the keyboarding requirements of his occupation.  (1500-01).  Her report states Graziano "has below-average fine and gross motor skills and dexterity that interfere with his ability to keyboard and complete desk work."  (909, 1196, 1501, 1796).  Vocational Expert Leopold concluded Graziano "would be unable to perform the duties of his own occupation or any occupation commensurate with his training, education, and experience."  (1502).

3.  Graziano Cannot Complete a Normal Work Schedule on a Consistent, Reliable, and Sustained Basis

Graziano's regular work schedule often exceeded 8 hours per day and 40 hours per week.  (1474-75).  Graziano, however, could not and cannot maintain even an 8 hour per day and 40 hours per week work schedule on a predictable, reliable, and consistent basis.  He requires frequent, unscheduled rest breaks (at least 3 to 5, in addition to normal breaks, that would put him off task 20% of the day), and he would be absent several times per month.[30]

Graziano cannot perform these duties due to: fatigue; reduced stamina; poor musculoskeletal endurance; and deterioration with activity.  (1141-64, 1680-84).  Graziano's inability to perform these requirements is demonstrated by (a) Dr. Jeffry Beer's assessment, (b) the repeat functional capacity evaluations, and (c) the assessment of vocational expert Leopold.

*Dr. Beer's Assessment*:  Dr. Beer assessed that Graziano would be off task 20% of a normal workday.  (1835).  Dr. Beer assessed that Graziano would need frequent unscheduled breaks (3 to 5 or more, each varying unpredictably in duration), during a normal 8-hour workday, in addition to normal work breaks.  (1029, 1683, 1776-77).  *See also* 1777 ("[Graziano] requires frequent breaks with any activity and must often change positions or lie down and rest.").

---

[30] On March 15, 2019, prior to benefit termination, Unum's own vocational consultant had agreed that Graziano does "not have the sustained, predictable capacity to allow for activities as noted by [the vocational review consultant]."  (458).

*The Repeat FCEs*:  During the 2020 repeat FCE evaluation, Graziano was observed to take frequent rest breaks due to increased symptoms, poor stamina, and decreased musculoskeletal endurance.  (987).  Graziano's easy fatigability and poor endurance are documented throughout both the 2020 and 2018 FCE reports.  (248, 252, 1158, 1340, 1359).  As Graziano's activity increased during FCE testing, so did his pain and other symptoms.

Both FCEs documented poor endurance and fatigue.  Graziano fatigues easily, especially when sitting or standing statically, and must change positions frequently (every 25 to 30 minutes for sitting at the onset of the test, then every 20 minutes or less once the test progressed and on the second day). (1158, 248-49).  At both FCEs Graziano was "more fatigued on the second day of testing and after manual material handling tasks."  (1341, 240).  The second day tasks "were carried out more slowly due to increased pain in the shoulders and lower back, as well as with notably increased fatigue." (1353, 247).

*The Assessment of Vocational Expert Leopold*:  Vocational Expert Leopold concluded that "Mr. Graziano is unable to tolerate a full-time work schedule and could be expected to be absent from work as a result of his symptoms several times monthly, which would not be tolerate[d] by any employer."  (1197).

4.  Graziano Cannot Meet the High-level Cognitive Demands

Graziano had a "skilled occupation" that required dealing with people, making judgments and decisions,[31] and attaining precise set limits, tolerances, and standards.  (1743-44).    To meet expectations, Graziano had to engage in highly complex analytical thinking, strategic problem solving, and planning.  (456).

---

[31] Unum states that Graziano's decision-making duties involve problem solving, making evaluations, and reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or qualifiable or factual data.  (1743-44).

28

Graziano could not and cannot meet the high-level cognitive demands due to: impaired attention and concentration (1390, 1645, 1670, 1807); severe pain (1390, 1807, 1774); sleep disturbance (1375); chronic fatigue (133, 1651, 1774, 1796, 1849); and time off task due to positional intolerances and a need for frequent breaks.  (1680-84, 1777, 1796).  Graziano's inability to perform these requirements is demonstrated by: (a) Dr. Jeffry Beer's assessment, (b) Graziano's consistent reports of distracting pain/fatigue, (c) the repeat functional capacity evaluations, and (d) the assessment of Vocational Expert Leopold.

*Dr. Beer's Assessment*:  Dr. Beer has consistently stated that Graziano remains limited in his ability to maintain attention and concentration to perform even simple work tasks.  Graziano had severe distracting pain, fatigue, and need for precomputed changes which would "limit his ability to meet deadlines and greatly reduce the quality of his work." (997, 1682, 1777, 1836).  Dr. Beer assessed that Graziano's symptoms would cause him to be "frequently off task, limit his ability to meet deadlines, and greatly reduce the quality of his work." (1777).

*Graziano's Consistent Reports of Distracting Pain/Fatigue*:  Graziano consistently reported pain (128, 131, 134-35, 140, 142-43, 146, 154, 161-62, 164, 169, 172, 174-75, 186, 197, 207, 209, 266-70, 272, 274-75, 277-78, 280-284, 285, 337-38, 352, 364, 368-69, 407-08, 414, 557, 560, 574, 580, 591, 594-95, 598, 658-59, 662, 670-71, 673-74, 748, 770, 909-10, 915, 953, 960-61, 965, 966-68, 980-81, 986-87, 989, 994-95, 999, 1087-88, 1096-99, 1100, 1201, 1202, 1774-75, 1784-86, 1835-36) and fatigue (134, 143, 146, 155, 916, 962, 968, 981, 987, 1508, 1670, 1680) throughout the file.

*The Repeat FCEs*:  The 2020 FCE report states: "Mr. Graziano was observed and noted to take frequent rest breaks due increased symptoms, poor stamina, and decreased musculoskeletal endurance.  This would take him off task and presumably affect his focus, attention span, and concentration." (987)

_Vocational Assessment of Vocational Expert Leopold_:   Vocational Expert Leopold's report corroboratively states, "Research has shown that chronic pain can cause faulty memory, loss of concentration, an inability to multi-task, and trouble with word-finding." (1195).  "Studies have found a consistent deficit in working memory in people with chronic pain, which interferes with attention and information processing." (_Id._)

5.  Graziano Cannot Meet the Business Travel Requirements

Graziano's regular occupation requires substantial business travel for client meetings and presentations with his laptop and business materials.  This evidence includes: the job description, Graziano's reported business travel, the assessment of Vocational Expert Leopold, and the assessments of Unum's own vocational experts.  All evidence is consistent and collaborative:

- _The Job Description_:  The job description provided by Graziano's employer confirmed the following requirement: "Willingness and ability to travel within the region, and air travel for client/broker meetings, as needed." (456).

- _Graziano's Reported Business Travel_:  Graziano reported that he had to travel for business at least twice per week – completing over 100 client visits per year. (377, 1630-31).  His "daily duties included visiting prospect and insured properties, performing thorough inspections of all facilities and exposures." (1472).  During his visits with clients, he had to "stand up for hours entertaining." (1486).

- _The Assessment of Vocational Expert Leopold_: Vocational Expert Leopold concluded, "The ability to travel to potential and existing clients is critical to Mr. Graziano's work." (1773).  Her report states, "[Graziano] spent a significant amount of time traveling to client meetings and presentations with his laptop and business materials." (1773, _see also id._ ("Mr. Graziano was required to travel locally and nationally approximately 100 times annually.")).

- _The Assessments of Unum's Own Vocational Consultants_:  Unum's own vocational consultants concluded that business travel is required:

  o _Ms. Marsiano_:  Unum's vocational consultant, Ms. Marsiano, concluded "travel is required." (1741).

  o _Ms. Rolph:_  Ms. Rolph conducted an "Occupational ID" analysis for Unum in which she confirmed that "it is reasonable that travel is required" after cross-referencing Graziano's occupation with the DOT. (619, _see also_ 802).  Ms. Rolph explained, "The Bureau of Labor Statistics Occupational Outlook Handbook outlines that some

property and casualty underwriters may travel to assess properties in person." (*Id.*, *see also* 619 ("travel is also required")).

o  <u>*Ms. O'Kelley*</u>:  Unum's vocational consultant, Ms. O'Kelley, confirmed, "[T]ravel is required via automobile or air." (1751, 1802).  Such travel would occur incidentally, rather than daily (1818) – inconsistent with Mr. Graziano's reports (travel approximately two times per week) and the job description (willingness and ability to travel "as needed").[32]

o  <u>*Mr. Peavy*</u>: Unum's vocational consultant, Mr. Peavy, stated that the "[t]he travel can occur via automobile and/or air, however the frequency cannot be determined as it is based on business need." (802).

Graziano could not and cannot meet the business travel requirements due to: inability to stand more than 20-25 minutes at one time (252, 265, 358, 405, 1177, 1772-75); inability to sit more than 25 minutes at one time (265, 358, 405, 1177, 1772-75); inability to walk more than occasionally (131-46, 265, 358, 405, 1177, 1772-75); slow dysfunctional gait pattern (961-96); poor balance (233-62); inability to lift greater than 16 pounds (131-46, 233-62, 961-96); inability to side carry greater than fourteen pounds (233-62, 961-96); inability to front carry more than 21 pounds (131-46, 233-62, 961-96); inability to reach overhead (1772-75); and a need for frequent rest breaks and positional changes with activity (1837-38).

Graziano's inability to perform the occupation's travel requirements is demonstrated by Dr. Beer's assessment, the repeat FCEs, the objective medical evidence, the assessment of Vocational Expert Leopold, and the Social Security decision of ALJ Levine.

• <u>*The Assessment of Dr. Beer*</u>:  Dr. Beer assessed that Graziano could only stand/walk for less than 30 minutes total in an 8-hour workday (358, 1682, 1849, 1774).[33]  Dr. Beer also confirmed that

---

[32]But, Ms. O'Kelley also concluded that "[t]he activities of direct sells and meeting with clients is specific to the employer and are not a requirement of the insured's occupation." (1818).  As detailed *infra* at pp. 41-42, this conclusion is internally inconsistent with her own opinion, and is inconsistent with all other vocational evidence in the file.

[33] *See also* 1777 ("[Graziano] continues to experience debilitating pain and marked functional limitations that preclude more than occasional sitting standing or walking" [sic])).

Graziano is limited to lifting 10 pounds, and he can only do so 1 to 10% of an 8-hour workday (1040, 1177, 1683).  (*See* 1772-73).

- _The Repeat FCEs_:  The 2018 and 2020 FCE reports each demonstrated significant deficits in standing, walking, and lifting.  (*See supra*, pp. 19-20, 25-26, 28, 29).

- _The Objective Medical Evidence_:  The file contains abnormal diagnostic imaging of Graziano's lumbar spine (*see supra*, p. 21), hip (*see supra*, p. 22), and bilateral shoulders (*see supra*, p. 26), as well as the extensive abnormal clinical findings upon examination (*see supra*, p. 26).

- _Assessment of Vocational Expert Leopold_:  Vocational Expert Leopold confirmed that Graziano would need to spend a "significant amount of time traveling to client meetings and presentations with his laptop and business materials" (1773), which required him to lift up to 20 pounds and perform "extensive walking and standing." (1773).[34]  She concluded that the medical evidence demonstrated Graziano cannot meet these demands.

- _The Social Security Decision of ALJ Levine:_  ALJ Levine found that Graziano is incapable of meeting the demands of sedentary work – let alone tasks requiring a capacity for light work -- and that no jobs exist in the national economy which Graziano can perform.  (Ex. 1, p. 3, *see supra*, p. 8).

**B.  Unum's Evidence Is Insufficient to Shift the Balance of The Evidence in Its Favor**

Unum's evidence is insufficient to shift the balance of the evidence in Unum's favor.  Unum can proffer no examination evidence, clinical findings, test results, or surveillance.  The <u>only</u> evidence Unum can provide are the reports of its paper reviewers – namely, Dr. Scott Norris, the only doctor that Unum had review Graziano's file on appeal,[35] and Ms. O'Kelley, the last vocational consultant

---

[34] Vocational Expert Leopold offered the only vocational opinion in the file as to the physical demands that this business travel entailed.  None of Unum's vocational experts commented on the specific standing, walking, or lifting requirements, whereas Vocational Expert Leopold did.  One of Unum's vocational consultants, Ms. O'Kelley, only vaguely opined that the travel requirements did not justify categorizing the job as "light," rather than "sedentary." (1815-19).  This is even though travel is clearly not performed while sitting at a desk.  *See* discussion *infra*, pp. 41-42.

[35] Unum's other reviewing physicians, Dr. Weinstein (821-24) and Dr. Sergile (828-29), reviewed a substantially incomplete version of the file prior to Graziano's appeal submissions.  They never reviewed <u>any</u> of Graziano's appeal evidence, including (without limitation): the repeat 2020 Functional Capacity Evaluation (961-96); the assessments from Dr. Beer (997-1001, 1776-77, 1835-36); repeat diagnostic testing (1788-89, 1790-91); updated treatment notes (1393-1467, 1776-85); and Graziano's affidavit (1619-40).

Unum used on appeal.[36]  When balancing Graziano's evidence (*see supra* Section II.A) with the reports of Unum's reviewers, a preponderance of the evidence favors an award of benefits to Graziano.

For the reasons detailed below, Unum's evidence is insufficient to outweigh Graziano's evidence because: (1) Dr. Norris' medical opinions are unreliable; and (2) Ms. O'Kelley's vocational opinions are unreliable.

1. Dr. Norris' Medical Opinions are Unreliable

Dr. Norris found no medical restrictions/limitations relevant to the material and substantial duties detailed *supra* in Section II.A.  This is even though Dr. Norris' opinion is based solely on his review of the files Graziano's examining professionals, who all concluded the opposite.  (265, 358, 405, 819, 994-96, 997-99, 1772-75, 1776-77, 1835-36, 310-13).

The court should reject the opinions of Dr. Norris because: (a) Dr. Norris did not review all relevant evidence, (b) Dr. Norris did not examine Graziano in person, (c) Dr. Norris' opinions are internally inconsistent, (d) Dr. Norris made multiple factual misstatements, and (e) Dr. Norris lacks credibility.

a. *Dr. Norris Did Not Review All Relevant Evidence*

Dr. Norris did <u>not</u> review all of Graziano's medical evidence.[37]  As described *supra* in Section I.A, Dr. Norris did not review all records from Generations Physical Therapy (1837-42) and a statement that Dr. Beer submitted in direct response to Dr. Norris' report (1835-36).

---

[36] Unum's other vocational consultants, Ms. Rolph (618-20) and Mr. Peavy (802), reviewed a substantially incomplete version of the file prior to Graziano's appeal evidence. They never reviewed <u>any</u> of Graziano's appeal evidence, including (without limitation) the reports from Vocational Expert Leopold (1374-92, 172-75), and the medical evidence detailed *supra* at p. 12.

[37] Unum's other medical reviewers, Drs. Weinstein (821-24) and Sergile (828-29), also did not review all of Graziano's records.  For example, even though it was available to her, Dr. Weinstein did not consider bilateral shoulder MRI reports from 2018, which revealed numerous objective abnormalities. (368-69).  Dr. Sergile's review was even more incomplete.  He only reviewed three office visit notes of Dr. Beer (12/19/2021, 11/18/2019, and 6/11/2019), and Dr. Weinstein's incomplete report.

Without the benefit of reviewing these records, Dr. Norris made incorrect conclusions regarding the credibility of Graziano's symptoms, his compliance with recommended treatment, and the consistency of the evidence. (*See supra*, pp. 12-14).

b. *Dr. Norris Did Not Examine Graziano in Person*

The opinions of Dr. Norris are unreliable because although he admits that many of Graziano's symptoms relate to pain and fatigue (1811-13), Dr. Norris did not examine Graziano.[38] *See, e.g.*, *Chicco v. First Unum Life Ins. Co.*, 2022 U.S. Dist. LEXIS 37946, at *10-12 (S.D.N.Y. Mar. 3, 2022) (for "a disability claim based on complaints of pain . . . it is also significant that none of First Unum's physicians personally examined [plaintiff]."), *Khan v. Provident Life & Acc. Ins. Co.*, 386 F. Supp. 3d 251, 278-79 (W.D.N.Y. 2019) (because a claimant's disability was "based in large part on his subjective sensations of fatigue and pain," Provident's reliance on non-examining reviewers raised "questions about the thoroughness and accuracy of the benefits determination"), *Johnson v. Guardian Life Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 178061, at *31-33 (D. Conn. Oct. 27, 2017), *Diamond v. Reliance Std. Life Ins.*, 672 F. Supp. 2d 530, 537 (S.D.N.Y. 2009) ("especially when the chief symptoms of the illnesses are subjective . . . due weight should be given to the treating physician's findings").

Here, Graziano's physician, Dr. Beer, is in a better position to accurately assess Graziano's condition because he has been treating and examining Graziano in-person since 2015. (1089-90). Dr. Beer's opinions (*see supra,* pp. 13-14) are well reasoned and consistent with that of the objective testing evidence, the clinical findings, the extensive treatment history, and both objective FCEs. (*See supra,*

Neither of them reviewed <u>any</u> of Graziano's appeal evidence, including: the repeat 2020 Functional Capacity Evaluation (961-96); the assessments from Dr. Beer (997-1001, 1776-77, 1835-36); repeat diagnostic testing (1788-89, 1790-91); updated treatment notes (1393-1465, 1778-87); and Graziano's affidavit (1619-40).

[38] Unum's reviewers before the appeal likewise did not examine Graziano even though they also admit that his principal symptoms are pain and fatigue. (822-24, 828-29). Recognizing this inadequacy, ALJ Levine rejected as not persuasive the opinions of SSA doctors who "did not take into account claimant's subjective pain and the evaluations of all his treaters." (Ex. 1, p. 2).

pp. 13-14).  Dr. Beer also is well-qualified, being board-certified in both Physical Medicine and Rehabilitation and Pain Management, and is board-eligible in Electrodiagnostic and Neuromuscular Medicine.  (1833).  *Compare*, Dr. Norris: never examined Graziano, has not even treated patients since he started working for Unum in 2010,[39] offered an opinion contrary to all evidence he reviewed, and offered an opinion which is internally inconsistent, flawed, and not based on all relevant evidence.

In weighing the reliability of Dr. Beer versus Dr. Norris, the Court should take these factors into account.  Indeed, District Court may take into account any factors it considers relevant, "such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence."  *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F3d 127, 135 (2d Cir. 2001) ("Connors's treating physician, Dr. Reddy was more familiar with Connors's condition and medical history than Drs. Charney and Weilepp, who never examined Connors.  In any event, it seems anomalous to give less weight to someone in Dr. Reddy's position than to the views of professionals hired by plaintiff's adversary, an insurance company.").  *See also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 864 (2003).

    c.   *Dr. Norris' Opinions Are Internally Inconsistent*

Dr. Norris' opinions are also unreliable because they contain multiple contradictions that undermine his conclusions.  *See Alfano v. CIGNA Life Ins. Co.*, 2009 U.S. Dist. LEXIS 7688, at \*68-69 (S.D.N.Y. Jan. 30, 2009) (refusing to credit "evidence [that] is not only internally inconsistent, but also inconsistent with the record as a whole" in favor of "the actual data underlying that evidence" and "the opinions of Alfano's treating physicians"); *Byrom v. Delta Family Care-Disability & Survivorship Plan*, 343 F. Supp. 2d 1163, 1186 (N.D. Ga. 2004) ("Given the doctor's unexplained new conclusion and

---

[39] *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483 (E.D. Pa 2021).  *See also* discussion *supra* in Section I.B, regarding Dr. Norris' impartiality.

his earlier inconsistent conclusions, it is perhaps most useful to look at his factual findings, as opposed to his ultimate inconsistent conclusions about plaintiff's ability to work.").

| Dr. Norris' Inconsistent Factual Statement | Dr. Norris' Conclusion |
|---|---|
| Dr. Norris acknowledged:<br><br>Shoulder examinations by Dr. Steven Rokito, an orthopedic surgeon, documented "[m]oderately reduced active ROM [range of motion]. R[ight] shoulder - 120 deg forward elevation, 90 deg abduction, 10 deg external rotation, internal rotation below waist, 4/5 strength throughout, L[eft] shoulder. 150 deg forward elevation, 95 deg abduction, 25 degree extended rotation, internal rotation to waist, 4+/5 strength in both shoulders." (1732). Dr. Rokito also documented "[m]oderate reduction in ROM and some weakness were noted in both shoulders. Imaging showed bilateral OA [osteoarthritis], degenerative tendinopathy, and possible quadrilateral space syndrome." (1748).<br><br>Physical therapy providers documented "[m]inimally to moderately limited passive shoulder ROM noted bilaterally." (1732)<br><br>An "MRI showed of the R[ight] shoulder showed diffuse arthritic changes, tendinopathy, and possible quadrilateral space syndrome." (1748).<br><br>"Chronic physical exam findings included bilateral reduced Achilles reflexes, pain-limited reduction in lumbar ROM." (1749).<br><br>"Dr. Beer described moderate to severe pain-limited lumbar ROM and positive lumbar facet load testing." (1732). | Yet, Dr. Norris inconsistently concluded:<br><br>"Examination findings by [Graziano's] treating providers were limited and stable and did not support functional impairment precluding sedentary level occupational activity." (1734). |
| Dr. Norris acknowledged that Graziano "was a potential candidate for future shoulder arthroplasty for pain relief." (1748). | Yet, Dr. Norris inconsistently concluded that Graziano "did not require surgery for his back or shoulders." (1751). |
| Dr. Norris acknowledged that multiple MRIs that showed significant abnormalities, below:<br><br>"Lumbar MRI (10/6/17) showed an anterior limbus vertebra at L3, a large central to L-sided disc extrusion at L2/3 w/mass effect and minor | Yet, Dr. Norris inconsistently concluded, "Diagnostic testing/imaging did not identify structural disease or other pathologic conditions [consistent with] the severity of functional loss as reported by [Graziano]." (1749). |

| Dr. Norris' Inconsistent Factual Statement | Dr. Norris' Conclusion |
|---|---|
| encroachment on the L3 nerve root and moderate central canal stenosis, minor multilevel neuroforaminal stenoses [narrowing], facet arthropathy [an arthritis-like condition of the spine caused by degeneration] noted at L4/5 but not at other levels, central disc protrusion at L5/S1 w/ minor bilateral foraminal encroachment but no significant canal stenosis [narrowing]." (1732).<br><br>"9/10/20 - Lumbar MRI: 'Moderate multilevel degenerative disc disease', [herniated disc] at L2/3 w/ moderate central canal and L lateral recess stenosis causing impingement on the descending L-sided nerve roots, mild/moderate stenosis [narrowing] at L3/4, L4/5, and L5/S1 w/o evidence of impingement." (1802)<br><br>"9/10/20 - L hip MRI: tendinosis and low-grade partial tear of the L common hamstrings tendon, possible enchondroma of the L femur, pelvic/renal cyst." (*Id.*). | |

d. *Dr. Norris Makes Multiple Factual Misstatements*

Dr. Norris' opinions are filled with factual misstatements that are directly contradicted by the records he says he reviewed. These factual misstatements indicate Dr. Norris' unreliability.

***First***, Dr. Norris incorrectly states that "[d]iagnostic testing/imaging did not identify structural disease or other pathologic conditions [consistent with] the severity of functional loss as reported by [Graziano] or with other indicators of impairment that would preclude sedentary level activity." Dr. Norris attempts to support this blanket statement by finding that "[l]umbar imaging showed mild to moderate multilevel degenerative changes <u>without</u> evidence of severe nerve root impingement[40] or

---

[40] This is not the first time Dr. Norris has misrepresented the nerve impingement on an MRI in an attempt to find a claimant's pain was not supported by imaging. In *Rios v. Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 233953, at *11 (C.D. Cal. Dec. 10, 2020), Dr. Norris's opinion was based on his misrepresentation that a lumbar MRI was "without evidence of significant nerve root impingement" even though the MRI actually "showed stenosis and 'disc protrusion at L3-4 *contacting the right L3 nerve root*.'" *Id.* (emphasis supplied by the court).

spinal canal narrowing." (1731) (emphasis added).   Dr. Norris' statements are incorrect.   The

impression report of the 2020 lumbar spine MRI consistently documents nerve root impingement at

L2-3, as well as stenosis (synonymous with narrowing) at several levels of Graziano's lumbar spine

(L2-3, L3-4, L4-5, and L5-S1).

The impression report of the 2020 MRI of the lumbar spine states[41]

- "There is diffuse desiccation of the lumbar intervertebral discs, with moderate multilevel *disc space narrowing.*"  (1788) (emphasis added).

- "At L2-3, there is a bulging disc and large superimposed central to left paracentral disc herniation which *moderately narrows the central spinal canal* and left lateral recess, with *impingement upon the descending left-sided nerve roots.*  There is *mild bilateral foraminal stenosis [narrowing].*"     (*Id.*) (emphasis added).

- "At L3-4, there is a bulging disc-osteophyte complex, mildly eccentric to the left, which indents the ventral thecal sac and results in *mild right and mild to moderate left foraminal stenosis [narrowing].*" (*Id.*) (emphasis added).

- "At L4-5, there is a bulging disc and broad-based central herniation which indents the ventral thecal sac and mildly narrows the left lateral recess, without significant nerve root impingement. There is bilateral facet joint hypertrophy contributing to *moderate bilateral foraminal stenosis [narrowing].*"  (*Id.*).

- "At L5-S1, there is a diffuse disc bulge which indents the ventral epidural fat and in association with bilateral facet joint hypertrophy results in *moderate bilateral foraminal stenosis [narrowing].*" (*Id.*) (emphasis added).

Contrary to Dr. Norris' statement that no imaging was consistent with the severity of

functional loss reported by Graziano, it is medically accepted that "[i]f you have lumbar spinal stenosis,

you may have trouble walking distances or find that you need to lean forward to relieve pressure on

---

[41] The 2020 MRI of the lumbar spine documents a significant worsening in Graziano's spinal conditions from the 2017 MRI of the lumbar spine, which documented:

- Left lateral recess encroachment was present with disc material *exerting mass effect upon the traversing left L3 nerve root.*"  (179) (emphasis added).

- "Disc bulging with large superimposed central to left disc extrusion… [at L2-3] with… *mass effect [a mass pushing] upon the traversing left L3 nerve root.*"  (1436) (emphasis added).

- "moderate canal stenosis" or narrowing of the spinal canal at L2-L3.  (179, 954, 1241).

your lower back."[42]   And nerve root impingement can result in "pain, tingling, numbness, weakness, and reflex loss."[43]   These are Graziano's symptoms: (982) ("significant lower back pain" and "decreased ability to tolerate walking"); (986) ("stiffness of the . . . lower back, hips, and knees"); (981) ("lower extremity weakness"); and (981) ("a lordotic [swayback] posture and a slow pace").

**Second**, Dr. Norris states that the "[r]ecords do not support functional impairment related to a hip condition."   (1748).   Yet, Graziano's records contain ample evidence demonstrating abnormalities of the hip that indicate a functional impairment.  For example, the September 2020 MRI of Graziano's left hip showed tendinosis [degeneration of the tendon's collagen], low-grade partial tear of the left common hamstrings tendon, and lesions on Graziano's femur and pelvis. (1790).  Hip weakness, pain, and reduced range of motion was documented during both the 2018 FCE (238, 248-49, 252, 256, 258) and the 2020 FCE. (962, 966, 968-71, 980-83, 991, 994).

e.   *Dr. Norris Lacks Credibility*

Dr. Norris is not an independent doctor retained by Unum to provide an independent and objective assessment of Graziano's appeal.  He is a long-term employee of Unum.  *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483 (E.D. Pa 2021) ("Dr. Norris has worked at Unum since 2010 [and] has not treated patients since 2010.").   His relationship with Unum makes him biased.[44]

---

[42] Lumbar Spinal Stenosis, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health /conditions-and-diseases/lumbar-spinal-stenosis.

[43]   Lumbar   Radiculopathy   (Nerve   Root   Compression),   Emory   Healthcare, https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html.

[44] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[P]hysicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements.") (internal quotations omitted). Further, instead of "subcontracting out the review process" to "insulate itself from the impact of a structural conflict" caused by its dual role as the payor of benefits and the entity deciding whether those benefits should be paid, *see Bendik v. Hartford Life Ins. Co.*, 2010 U.S. Dist. LEXIS 70978, at *5 (S.D.N.Y. July 12, 2010), *aff'd*, 432 F. App'x 24 (2d Cir. 2011), Unum instead used Dr. Norris to review Graziano's files.

Moreover, Dr. Norris has an extensive and expanding track record throughout the country of providing unsupported, selective, and incomplete record reviews.  For example:

- *Barnes v. Unum Life Ins. Co. of Am.*, 2020 U.S. Dist. LEXIS 256497, at *26-27 (E.D. Tenn. Nov. 24, 2020) (criticizing Dr. Norris for: (1) rejecting the plaintiff's credible reports of pain severity; and (2) rejecting an FCE on the basis it was inconsistent with the evidence when it was not).

- *Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 710 (M.D. Tenn. 2021) (rejecting Dr. Norris' opinion as conclusory).

- *Boykin v Unum Life Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 27455, at *46 (E.D. Cal. Feb. 15, 2022) ("Dr. Norris' evaluation is entitled to little weight.").

- *Brown v. UNUM Life Ins. Co. of Am.*, 356 F. Supp. 3d 949, 961 (C.D. Cal. 2019) (criticizing the faulty foundation for Dr. Norris' opinion).

- *Carney v UNUM Life Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 61212, at *24 (E.D. Mich. Mar. 31, 2022) ("[A]t least some of Dr. Norris' conclusions are not borne out by the objective evidence present in the administrative record," also noting that Dr. Norris did not examine plaintiff "despite the fact that [the plaintiff's] complaints (pain and its ensuing effects) are highly subjective in nature and amenable to more effective evaluation and understanding when personal communication and observation is possible.").

- *Christoff v. Unum Life Ins. Co. of Am.*, 2019 U.S. Dist. LEXIS 167889, at *15, 27-28 (D. Minn. Sep. 30, 2019) (Dr. Norris "ignored information" and "Dr. Norris reache[d] conclusions contradicting those of several of the medical professionals who had previously examined and treated [the plaintiff].").

- *Chicco v. First Unum Life Ins. Co.*, 2022 U.S. Dist. LEXIS 37946, at *11 (S.D.N.Y. Mar. 3, 2022) (finding that Dr. Norris did not refute the conclusions of Chicco's treating physicians, and he improperly "discounted as not time-relevant physical findings from examinations performed after [the plaintiff] stopped working.").

- *Clark v. Unum Life Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 175341, at *46-47 (M.D. Tenn. Oct. 10, 2018) (criticizing Dr. Norris for his "conclusory findings" and "selective review" of the evidence).

- *Dewsnup v. Unum Life Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 208688, at *27 (D. Utah Dec. 10, 2018) ("[T]he court gives greater weight to the opinions of his treating physicians, who were better able to assess the veracity of Mr. Dewsnup's reports of pain. . . . [Dr. Norris] would have been well-served to meet with Mr. Dewsnup in person or request an independent medical examination.").

- *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483-84 (E.D. Pa 2021) (although Dr. Norris testified that he did not doubt the plaintiff's symptoms or the veracity of her treating physician, his report inconsistently discredited the plaintiff's reports of unpredictable and incapacitating symptoms).

- *Fleming v. Unum Life Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 200400, at \*34 (CD Cal Nov. 20, 2018) ("[T]he Court declines to credit Dr. Norris's opinion," because Dr. Norris "summarily concluded that Fleming's self-reported pain and lack of capacity were inconsistent with the 'minimal findings on physical examinations.'").

- *Hannon v. Unum Life Ins. Co. of Am.*, 988 F. Supp. 2d 981, 985-86, 992 (S.D. Ind. 2013) (rejecting Dr. Norris' opinion as "nothing short of arbitrary").

- *Rios v. Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 233953, at \*11, 21 (C.D. Cal. Dec. 10, 2020), *rev'd in part on other grounds*, 2021 U.S. App. LEXIS 38138 (9th Cir. Dec. 27, 2021) (rejecting Dr. Norris' opinion as unreliable, at least in part, because he incorrectly claimed that an MRI of the lumbar spine showed no nerve root impingement).

- *Tam v. First Unum Life Ins. Co.*, 491 F. Supp 3d 698, 707, 711 n.11 (C.D. Cal. 2020) ("Dr. Norris dismissed the CPET Report and Neuropsychological Evaluation as 'not time-relevant.' . . . However, it is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis.").

2. <u>Ms. O'Kelley's Vocational Opinion Is Unreliable</u>

Ms. O'Kelley found that travel was an employer-specific requirement, rather than a requirement of Graziano's occupation. She also concluded that travel would not require an ability to perform tasks at the light demand level. These conclusions are unreliable for three reasons.

**First**, Ms. O'Kelley's opinion is contrary to all evidence and other opinions in the file. Unum had three other vocational consultants analyze the material and substantial duties of Graziano's occupation. All unanimously and consistently found that his occupation required travel. (*See supra*, pp. 30-31). This is corroborated and supported by the vocational assessment of Vocational Expert Leopold (including a labor market study), the job description, and Graziano's own reports. (*See supra*, p. 30).

**Second**, Ms. O'Kelley's opinion on travel is internally inconsistent. First, Ms. O'Kelley concluded, "[T]ravel is required. The travel can occur via automobile or air." (1754, 1806). Such

travel would occur incidentally, rather than daily (1818). Then, without citing any new evidence or facts, she concluded that "activities of direct sells and meeting with clients is *specific to the employer* and are *not a requirement of the insured's occupation*." (1818) (emphasis added).

*Third*, Ms. O'Kelley's statement about the physical requirements of business travel is conclusory. Specifically, Ms. O'Kelly concluded that the travel requirements did not justify categorizing the work as "light," rather than "sedentary." (1815-19).[45] But, she does not support this conclusion with any facts. Ms. O'Kelley does not explain what she considers the lifting, standing, and walking requirements of business travel to be. Nor does she explain how these requirements could be met at the sedentary level. *Compare,* Vocational Expert Leopold who specifically stated that "travel required extensive walking and standing," thus evaluating such to the "light physical demand level." (1773).

### III.   AS A REMEDY, THE COURT SHOULD REINSTATE GRAZIANO'S BENEFITS, OR, IN THE ALTERNATIVE, REMAND GRAZIANO'S CLAIM BACK TO UNUM FOR ADDITIONAL DEVELOPMENT OF THE RECORD

An award of benefits is proper upon a finding under *de novo* review that a preponderance of the evidence supports disability. *See, e.g.*, *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir. 1999), *Chico v. First Unum Life Ins. Co.,* 2022 U.S. Dist. LEXIS 37946, *14 (S.D.N.Y. Mar. 3, 2022), *reconsideration granted on other grounds*, 2022 U.S. Dist. LEXIS 59742 (S.D.N.Y. Mar. 30, 2022), *Thoma v. Fox Long Term Disability Plan*, 2018 U.S. Dist. LEXIS 209077, *91 (S.D.N.Y. Dec. 11, 2018).

Here, because Graziano has demonstrated by a preponderance of the evidence (*see supra* Section II) that he meets the definitions of disability in the LTD Plan and Life Plan, this court should

---

[45] Unum follows the Department of Labor's definition of light work as an occupation with "[p]hysical demand requirements [that] are in excess of those for sedentary work. Light work usually requires walking or standing to a significant degree." *Troy v. Unum Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 14965, at *14 (S.D.N.Y. Mar. 31, 2006).

award long term disability benefits as of January 2, 2020 and waiver of premium benefits under the Life Plan.

However, should the Court find the evidence in the record to be insufficient to establish disability by a preponderance of the evidence, the Court should not grant judgment in favor of Unum. Instead, the Court should remand Graziano's claim back to Unum for a full and fair review and further development of the record.

As described in Section I above, Unum deprived Graziano of a full and fair review, which adversely prejudiced the development of the record. *See Halo v. Yale Health Plan*, 819 F.3d 42, 60 (2d Cir. 2016) ("Entitling a claimant to de novo review based on a plan's failure to comply with the claims procedure regulation may be cold comfort if the plan's own compliance failures produced an inadequate administrative record that would prevent a full and fair hearing on the merits."), *Martin v. Hartford Life & Acc. Ins. Co.*, 478 F. App'x 695, 698 (2d Cir. 2012) ("A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review."), *Magee v. Metro. Life Ins. Co.,* 632 F. Supp. 2d 308, 321-22 (S.D.N.Y. 2009) (remanding to MetLife to consider a new claim), *see also Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, 217 F. Supp. 3d 608, 633-34 (N.D.N.Y. 2016) (collecting cases).

## **CONCLUSION**

For the foregoing reasons, the Court should grant judgment in favor of Graziano.

Dated: New York, New York
      April 26, 2022

                  By:  _____

                          Matthew Maddox
                          Jennifer Hess
                          RIEMER HESS LLC
                          *Attorneys for Plaintiffs*
                          275 Madison Avenue, 26th Floor
                          New York, New York 10016
                          (212) 297-0700
                          mmaddox@riemerhess.com