UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                              :        CASE NO. 1:21-CV-2708(PAC)
MICHAEL J. GRAZIANO,                                          :
                                                              :
                          Plaintiff,                          :
        -- against --                                         :
                                                              :
FIRST UNUM LIFE INSURANCE COMPANY,                            :
                                                              :
                          Defendant.                          :
                                                              :
------------------------------------------------------------- x


**<u>DEFENDANT FIRST UNUM LIFE INSURANCE COMPANY'S BENCH TRIAL BRIEF</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................... **ERROR! BOOKMARK NOT DEFINED.**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ..................................................................... 2

    A.    THE PLAN ................................................................... 2

    B.    FIRST UNUM APPROVED PLAINTIFF'S CLAIM ........................................... 4

    C.    FIRST UNUM CONTINUED TO REVIEW EVIDENCE AND TERMI-NATED BENEFITS IN JANUARY 2020 ........................... 6

    D.    PLAINTIFF ADMINISTRATIVELY APPEALED, AND FIRST UNUM UPHELD ITS DETERMINATION ....................... 13

    E.    THE 2021 SSDI DETERMINATION IS IRRELEVANT ................................. 22

ARGUMENT ....................................................................................... 22

    I.    THE COURT SHOULD REVIEW FIRST UNUM'S DETERMINATION UNDER THE DE NOVO STANDARD OF REVIEW ....................... 22

    II.    FIRST UNUM COMPLIED WITH SECTION 503-1 AND PROVIDED A FULL AND FAIR REVIEW ...................... 23

    III.    PLAINTIFF MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT HE IS DISABLED WITHIN THE MEANING OF THE PLAN AS OF JANUARY 3, 2020 ....................... 26

        A.    THE PREPONDERANCE OF THE EVIDENCE CONFIRMS THAT FIRST UNUM CORRECTLY DETERMINED PLAINTIFF WAS NOT DISABLED AS DEFINED BY THE PLAN AS OF JANUARY 2020 ....................... 27

            1.    THE MEDICAL EVIDENCE DOES NOT ESTABLISH DISABLING RESTRICTIONS AND LIMITATIONS DUE TO A BACK CONDITION ....................... 28

            2.    THERE IS NO CREDIBLE EVIDENCE THAT PLAINTIFF IS DISABLED DUE TO SHOULDER, HIP OR COGNITIVE ISSUES ....................... 37

            3.    THE VOCATIONAL EVIDENCE DOES NOT ESTABLISH DISABILITY BY A PREPONDERANCE OF THE EVIDENCE ....................... 39

            4.    THE SSDI DETERMINATION DOES NOT SUPPORT PLAINTIFF'S CLAIM ....................... 42

    IV.    PLAINTIFF IS NOT ENTITLED TO BENEFITS "THROUGH THE PRESENT" ....................... 45

# TABLE OF CONTENTS
(continued)

Page

CONCLUSION ...................................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Prudential Ins. Co. of Am.*,
  280 F.Supp.2d 731 (N.D.Ohio 2003)......................................................................................32

*Addington v. Senior Vice President Hum. Res. Consol Energy, Inc.*,
  841 Fed. Appx. 443 (3d Cir. 2020)........................................................................................44

*Barnes v. Unum Life Ins. Co. of Am.*,
  2020 U.S. Dist. LEXIS 256497 (E.D. Tenn. Nov. 24, 2020) .................................................35

*Black & Decker Disab. Plan v. Nord*,
  538 U.S. 822 (2003)........................................................................................31, 33, 43

*Boersma v. Unum Life Ins. Co. of Am.*,
  546 F. Supp. 3d 703 (M.D. Tenn. 2021)................................................................................35

*Boykin v. Unum Life Ins. Co. of Am.*,
  No. 19-cv-137, 2022 WL 456213 (E.D. Calif. Feb. 15, 2022)...............................................36

*Brown v. Colvin*,
  146 F. Supp.3d 489 (W.D.N.Y. 2015)....................................................................................44

*Bumpas v. Unum Life Ins. Co. of Am.*,
  No. 803-CV-2105T27-TGW, 2005 WL 2428537 (M.D. Fla. Sept. 30, 2005).................30, 34

*Burell v. Prudential Ins. Co. of Am.*,
  820 F.3d 132 (5th Cir. 2016) .................................................................................................43

*Chandler v. Underwriters Lab.*,
  850 F.Supp. 728 (N.D.Ill.1994) .............................................................................................32

*Chicco v. First Unum Life Ins. Co.*,
  No. 20-cv-10593, 2022 WL 973733 (S.D.N.Y. March 30, 2022)...........................................45

*Connors v. Connecticut Gen. Life Ins. Co.*,
  272 F.3d 127 (2d Cir. 2001)...................................................................................................29

*Cook v. New York Times Co. Long-Term Disability Plan*,
  No. 02 CIV. 9154 (GEL), 2004 WL 203111 (S.D.N.Y. Jan. 30, 2004) .................................23

*Critchlow v. First Unum Life Ins. Co. of Am.*,
  378 F.3d 246 (2d Cir. 2004)...................................................................................................27

*Curtis v. Aetna Life Ins. Co.*,
    No. 3:19-CV-01579, 2021 WL 1056785 (D. Conn. Mar. 18, 2021) .....................................23

*Daniel v. UnumProvident Corp.*,
    261 F. App'x 316 (2d Cir. 2008) .........................................................................................43

*DeCesare v. Aetna Life Ins. Co.*,
    95 F. Supp.3d 458 (S.D.N.Y. 2015).....................................................................................40

*Dewsnup v. Unum Life Ins. Co. of Am.*,
    No. 17-cv-126, 2018 WL 6478886 (D. Utah. Dec. 10, 2018) ........................................36, 37

*Dorris v. Unum Life Ins. Co. of Am.*,
    949 F.3d 297 (7th Cir. 2020) ...............................................................................................35

*Dramse v. Delta Family-Care Disability & Survivorship Plan*,
    269 Fed. App'x 470 (5th Cir. 2008) ....................................................................................34

*Fitzpatrick v. Bayer Corp.*,
    No. 04 Civ. 5134, 2008 WL 169318 (S.D.N.Y. Jan. 17, 2008).............................................27

*Halo v. Yale Health Plan*,
    819 F.3d 42 (2d Cir. 2016)........................................................................................23, 26, 42

*Hans v. Unum Life Ins. Co.*,
    o. CV 14-2760, 2015 WL 5838462 (C.D. Calif. Oct. 5, 2015) .............................................35

*Hobson v. Metro. Life Ins. Co.*,
    574 F.3d 75 (2d Cir. 2009)...............................................................................................29, 34

*Jeter v. Comm'r of Soc. Sec. Admin.*,
    76 F. App'x 809 (9th Cir. 2003) ..........................................................................................30

*Krizek v. Cigna Group Ins.*,
    345 F.3d 91 (2d. Cir.2003)....................................................................................................29

*Lee v. Aetna Life & Cas. Ins. Co.*,
    No. 05 CIV. 2960 (PAC), 2007 WL 1541009 (S.D.N.Y. May 24, 2007) .............................27

*Locher v. UNUM Life Ins. Co. of Am.*,
    389 F.3d 288 (2d Cir. 2004)..................................................................................................42

*Louis v. Genworth Life & Health Ins. Co.*,
    2008 WL 4450264 (D. Mass. Sept. 30, 2008) ......................................................................34

*Luna v. UNUM Life Ins. Co. of Am.*,
    No. CV 20-202 JCH-JHR, 2021 WL 4307294 (D.N.M. Sept. 22, 2021)...............................35

*Magee v. Metro. Life Ins. Co.*,
632 F. Supp. 2d 308 (S.D.N.Y. 2009)....................................................29

*Martinez v. Standard Ins. Co.*,
2021 WL 4592430 (5th Cir. Oct. 5, 2021)............................................45

*McDonnell v. First Unum Life Ins. Co.*,
No. 10 CV 8140 RPP, 2013 WL 3975941 (S.D.N.Y. Aug. 5, 2013) ..........................22, 23, 30

*Napoli v. First Unum Life Ins. Co.*,
2005 WL 975873 (S.D.N.Y. Apr. 22, 2005)..........................................31

*Nelson v. Unum Group Corp.*,
No. 1:13-cv-58, 2014 WL 3908183 (E.D. Tenn. Aug. 11, 2014).........................35

*Nelson v. Unum Life Ins. Co. of Am.*,
421 F. Supp. 2d 558 (E.D.N.Y. 2006), aff'd, 232 F. App'x 23 (2d Cir. 2007) ...............32, 40

*Onge v. Unum Life Ins. Co. of Am.*,
No. 3:07CV01249 AWT, 2010 WL 3802787 (D. Conn. Sept. 20, 2010) .............................32

*Ovist v. Unum Life Ins. Co. of Am.*,
14 F.4th 106 (1st Cir. 2021)...............................................35

*Paese v. Hartford Life & Acc. Ins. Co.*,
449 F.3d 435 (2d Cir. 2006)...............................................26

*Pellegrino v. First Unum Life Ins. Co.*,
No. 1:20-CV-484, 2021 WL 3912238 (N.D.N.Y. Sept. 1, 2021).....................28, 29, 34, 35

*Phillips v. Aetna Life Ins. Co.*,
2021 WL 5449289 (D. Minn. Nov. 22, 2021) ......................................21

*Schleicher v. Ascension Health*,
2006 WL 686374 (M.D. Tenn. Mar. 17, 2006) ......................................34

*Tortora v. SBC Comms., Inc.*,
739 F.Supp.2d 427 (S.D.N.Y.2010)...............................................29

*Tretola v. First Unum Life Ins. Co.*,
2015 WL 509288 (S.D.N.Y. Feb. 6, 2015)...............................................27

*Wagner v. First Unum Life Ins. Co.*,
No. 02 CIV. 9135 (RLC), 2003 WL 21960997 (S.D.N.Y. Aug. 13, 2003),
aff'd, 100 F. App'x 862 (2d Cir. 2004)...............................................40

## Rules and Regulations

20 C.F.R. 404 ...............................................22, 43, 44

29 C.F.R. § 2560.503 ................................................................................23, 24, 25, 26

81 Fed. Reg. 92316 (Dec. 19, 2016) Section 503-1(h)(4) ......................................................24, 25

Defendant, First Unum Life Insurance Company ("First Unum"), respectfully submits this Bench Trial Brief, and seeks judgment in First Unum's favor on all of the claims asserted by Plaintiff Michael J. Graziano.[1]

## PRELIMINARY STATEMENT

Plaintiff challenges First Unum's administrative determinations on his claims for long term disability ("LTD") benefits and life insurance waiver of premium ("LWOP") benefits, under the Swiss Re America Holding Corporation Health and Welfare Plan ("Plan"). Plaintiff contends that his lumbar spinal and shoulder conditions rendered him unable to perform the material and substantial duties of his regular occupation (the LTD test) as of January 3, 2020, and also unable to perform the duties of any gainful occupation (the LWOP test), as of the same date.

At its core, this is an orthopedic claim, which rises and falls with Plaintiff's reports of back pain. As shown herein, and as First Unum already determined, the contemporaneous medical evidence does not support or explain the degree and severity of Plaintiff's complaints and other subjective symptoms, and does not establish that Plaintiff lacked the functional capacity to perform the duties of his regular occupation.

Plaintiff's Trial Brief (as with his arguments on administrative appeal) shifts with the tides, raising issues related to his shoulders, hips, obesity, and even his cognitive abilities, that are simply not supported by the medical records, or even by his long-time treating physicians. The non-back related medical conditions Plaintiff raised in the internal claim process, and again in his Trial Brief, are easily dismissed and certainly did not result in him being totally disabled under either definition. Plaintiff also spends an inordinate amount of time on irrelevancies in an

---

[1] The Stipulated Record is referenced herein in accordance with the Affirmation of Matthew Maddox ("Maddox Aff.") filed April 26, 2022. Dkt. No. 36. For purposes of this brief, First Unum uses following Bates numbering scheme: Maddox Aff. Ex. 1: SSDI 1-8; Maddox Aff. Ex. 2: LTD 1-1873; Maddox Aff. Ex. 3: LWOP 1-346; Maddox Aff. Ex. 4: LTD Policy 1-41; and Maddox Aff. Ex. 5: Life Policy 1-64.

attempt to distract the Court from Plaintiff's lack of actual evidence supporting his claim. These include an unsupported argument that First Unum failed to provide Plaintiff a full and fair review; reliance on a Social Security determination which was never considered on administrative review, was based on a different evidentiary record, and applied different standards; and unwarranted attacks on First Unum's reviewing physicians.

In sum, Plaintiff has not met his burden of establishing by a preponderance of the evidence that he was disabled after January 3, 2020, and First Unum is entitled to judgment in its favor. In the event the Court finds that Plaintiff established his claim for LTD benefits and/or LWOP benefits as of January 3, 2020, the Court should not adopt Plaintiff's request for an award through the date of judgment, but should remand to First Unum to determine whether Plaintiff qualifies for benefits after the close of the administrative record.

## STATEMENT OF FACTS

### A.    The Plan

Swiss Re America Holding Corporation ("Swiss Re") established and/or maintained the Plan to provide Health and Welfare benefits to various employees. In order to fund LTD and life benefits, Swiss Re obtained from First Unum Group Disability Insurance Policy No. 405256 001 ("LTD Policy") and Group Life and Accidental Death and Dismemberment Insurance Policy No. 405256 002 ("Life Policy). Maddox Aff., Exs. 4 and 5.

The LTD Policy defines disability as follows:

> You are disabled when Unum determines that:
>
> - You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury..

LTD Policy 16. Further, the LTD Policy provides that "After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." *Id.*

"Regular Occupation" is the "occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.*, LTD Policy 33.

The LTD Policy states that First Unum "will stop sending you payments and your claim will end on the earliest of the following… when you are able to work in your regular occupation on a part-time basis and you do not[;] … the date you are no longer disabled under the terms of the plan[;] … the date you fail to submit proof of continuing disability." *Id.*, LTD Policy 22.

The Life Policy states that, in the event of disability: "Your life insurance coverage may be continued for a specific time and your life insurance premium will be waived if you qualify as described below." LWOP Policy 33. It then defines disability as follows:

> You are disabled when Unum determines that:
>
> - during the elimination period, you are not working in any occupation due to your injury or sickness; and
>
> - after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

*Id.*, LWOP Policy 34. "Gainful Occupation" is defined as "an occupation that within 12 months of your return to work is or can be expected to provide you with an income that is at least equal to 60% of your annual earnings in effect just prior to the date your disability began." *Id.*, at 52.

The Life Policy further provides that the life insurance premium waiver will automatically end if: "you recover and are no longer disabled; [or] you fail to give us proper proof that you remain disabled[.]" *Id*., at 34.

## B.    First Unum Approved Plaintiff's Claim

Plaintiff claims that he became disabled from his job as a Senior Property Underwriter on October 16, 2018. Through his attorney, he applied for LTD and LWOP benefits on February 27, 2019. LTD 515-530.[2]

The Administrative Record for the LTD claim includes information that Plaintiff submitted from October 2018 through March 2019. Plaintiff's Brief does not address this information in any significant detail, but several key pieces of information are noteworthy, including:

- There were repeated notations that Plaintiff had been experiencing pack pain since 2010. LTD 127, 160.

- During a phone call between First Unum and Plaintiff (with his attorney present), Plaintiff advised that his job allowed him "work from home so he had some flexibility[.]" LTD 376.

- Plaintiff's October 2018 Functional Capacity Evaluation from Best Physical Therapy Associates ("FCE") categorized Plaintiff's job as "light (with medium components)," based on a job description provided by Plaintiff. LTD 00143.

- The FCE noted that Plaintiff's functional status/activity level included housekeeping; ability to drive short distances; and ability to perform computer work with help, but must get up each hour to stretch. LTD 129.

- Plaintiff's treating physician, Jeffry R. Beer, M.D., stated on October 16, 2018, that "[g]iven the nature of his job, he is unable to physically perform his normal duties" and noting an "inability to perform prolonged walking, standing and sitting." LTD 00159. In December 2018, Dr. Beer listed Plaintiff's current restrictions as "no lifting > 20 lbs; no bending/stooping/climbing; no prolonged standing/sitting > 30-60 mins." LTD 334-336.

- Dr. Beer stated Plaintiff "has difficulty getting into the office in Manhattan." LTD 160, 168.

- November 9, 2018 medical notes indicate "No opioids prescribed in this case." LTD 279.

---

[2] Plaintiff received short term disability benefits ("STD") from October 23, 2018 through April 15, 2019.

- An office visit note from Sidney Stein, M.D. (internal medicine) from August 8, 2017 states that Plaintiff "has full rom [range of motion] of his LS [lumbar-sacral] spine. There is no pain on straight leg raising or with hip rotation or abduction or adduction." LTD 199.

Swiss Re's Job Description for Senior Underwriter described the job as "underwriting of new and existing accounts, as well as marketing and relationship development[.]" LTD 456. It stated that the market was "North American Property, Eastern Region," and that while the "position location will be in the New York City office[,]" Swiss Re expected "[w]illingness and ability to travel within the region, and air travel for client/broker meetings, as needed." *Id.*

During a March 2019 multidisciplinary meeting to evaluate the claim, First Unum's vocational rehabilitation consultant, Katherine Rolph, M.S., CRC, reviewed the available vocational information, and reported that, contrary to Plaintiff's FCE, his occupation was "Sedentary," and involved mostly sitting, with standing or walking for brief periods of time, with flexibility "for changes in position for brief periods of time throughout the day." LTD 458. Further, she stated "[t]he Bureau of Labor Statistics Occupational Outlook Handbook outlines that Property and Casualty Underwriters may travel to assess properties in person. Therefore, it is reasonable that travel would be required." *Id.*

Based on the information submitted, First Unum approved Plaintiff's LTD claim on March 20, 2019. LTD 466-470. First Unum specifically acknowledged that Plaintiff was undergoing a three-month course of physical therapy, and advised: "In order to determine when you will regain the capacity to return to work, we will request updated medical information from your physician(s) once you have completed physical therapy." LTD 467.

First Unum also approved Plaintiff's LWOP claim on March 28, 2019. LWOP 223-226.

**C.** **First Unum Continued to Review Evidence and Terminated Benefits in January 2020**Error! Bookmark not defined.

First Unum spoke with Plaintiff in May 2019, and he described his back pain as follows: "It ranges from a sharp shooting pain when he makes the wrong move. If [he] sits too long (30 minutes) he has to stand. It's painful when he gets up in the mornings." LTD 547. He described his shoulder pain as "more of a moderate pain with aching vs sharp pain." *Id.* He said his doctor "said he needs a shoulder replacement but … [he] is waiting until it's worse b/f [before] he pursues the surgery. [He] is not at that point yet." *Id.*[3] Asked to describe a typical day, he said that he "will do light shopping" and "is online[.]" LTD 549. Plaintiff stated that he did not think he could return to work at that time, but that he had an "open invention [sic] to reapply" with Swiss Re and that "the rest of the insurance market is open to him as well." LTD 548-549.

Plaintiff provided physical therapy notes from February to May 2019. LTD 557-590. Plaintiff told his therapist on March 28, 2019, that he had been traveling and carrying luggage, after which he felt "stiff and achy" in both shoulders and low back. LTD 584. Plaintiff's initial diagnoses included intervertebral disc disorders with radiculopathy, lumbosacral region and segmental and somatic dysfunction of lumbar region (LTD 594), but by April 11, 2019, he reported his back was feeling better (LTD 568) such that, by April 24, 2019 the only active diagnosis was primary osteoarthritis of the right and left shoulder. LTD 557, 574. The PT notes do not list any complicating factors or co-morbidities, and they consistently state that there is no impairment of Plaintiff's mental status or cognitive function. LTD 557, 562, 564, 566, 568, 570, 572, 574, 576, 578, 580, 582, 594.

---

[3] A year later, Plaintiff admitted: "I have yet to follow up" with this recommendation "as I feel I am too young for a shoulder replacement." LTD 1287.

First Unum obtained a written vocational review in June 2019 from Ms. Rolph. LTD 618-619. She determined, based on her review of "[t]he vocational documents in the LTD claim file[,]" that "the occupation in the national economy is most consistent with Insurance Underwriter Commercial Property, eDOT 169.267-200." LTD 618. She reported that "[t]he Bureau of Labor Statistics Occupational Outlook Handbook outlines that some property and casualty underwriters may travel to assess properties in person. Based on this information, it is reasonable that travel is required." LTD 618-619. She disagreed with the FCE Plaintiff previously submitted, to the extent that the FCE claimed Plaintiff's "job requires lifting up to 20 pounds" because the eDOT "outlines that the maximal exertion required is up to 10 pounds of force," and, therefore, any lifting in excess of that "would be specific to the insured's job as performed with his specific employer, and not as the occupation is performed in the national economy." LTD 619. Finally, Ms. Rolph reported that the occupation is performed "[m]ostly sitting, [and] may involve standing or walking for brief periods of time," but also that "this occupation would allow for changes in position for brief periods of time throughout the day." *Id.*

First Unum wrote to Plaintiff's treating physician, Dr. Beer, in June 2019, providing the occupational duties detailed by Ms. Rolph, and asking for his opinion regarding Plaintiff's functional capacity and current treatment. LTD 656-657. In response, Dr. Beer stated that Plaintiff could not perform those duties on a full time basis, and that his restrictions and limitations were "no lifting > 15 lbs, no standing > 30 mins; no sitting > 30 mins; no bending, stooping, crawling, climbing." LTD 656. Dr. Beer's restrictions do not appear to reflect any material shoulder limitations, and do not address the impact of the ability to change positions on Plaintiff's sitting

tolerance.[4] Dr. Beer also said that Plaintiff had a "fair" prognosis for returning to employment, and that his current course of treatment was physical therapy and chiropractic treatment. LTD 657.

Dr. Beer provided a June 11, 2019 office visit note, which stated that Plaintiff was complaining of "significant lumbar pain with only rare lower limb radiating pain symptoms." LTD 658. His physical examination of Plaintiff's spine was normal except for "Bilaterally Achilles reflexes are symmetrically reduced. … Lumbar ROM is moderately to severely pain limited. Lumbar facet load testing is positive bilaterally." LTD 659. Dr. Beer "personally interpreted" an MRI of the lumbar spine, and opined that it was "most significant for a small left sided protrusion at L2-3 that does not cause any significant central canal or nf [neural foraminal] stenosis." *Id.* Dr. Beer's stated plan for Plaintiff was to commence a "McKenzie tailored spine stabilization program with a certified therapist and an appropriate postural bias." *Id.*[5] Dr. Beer continued to note that he had not prescribed any opioids. LTD 660.

First Unum evaluated this information, and determined that, "[g]iven the available information, it is medically reasonable that [Plaintiff] would not have the sustained, predictable capacity to allow for activities as noted by [Ms. Rolph]. Prognosis for RTW [return to work] is guarded." LTD 665. First Unum scheduled the claim for further review in four months "to allow for further treatment and response." *Id.*

First Unum spoke to Plaintiff again in October 2019 (LTD 719-22), and he advised that his back was "unchanged." He said that he had two visits with a chiropractor but was not sure if he

---

[4] If Dr. Beer intended to say that Plaintiff could only sit and stand for a total of 30 minutes each per day (as opposed to 30 minutes before requiring a change in position), it would necessarily be saying that Plaintiff was bedridden for 23 hours in the day. Neither Plaintiff nor Dr. Beers has suggested such a limit on Plaintiff's functional capacity.
[5] The McKenzie method is described as an "exercise based approach of assessment, diagnosis and treatment [that] … allows patients to learn the principles and empowers them to be in control of their own symptom management, which can reduce dependency on medical intervention." https://www.mckenzieinstituteusa.org/method-patients.cfm.

would go again. He acknowledged that he put physical therapy "to the side." Regarding his shoulder, he said that it "felt good" when he was pursuing physical therapy, and that he was more likely to go back to it for his shoulder than his back. He said that he had not seen Dr. Marzeck (orthopedic doctor for his shoulder) or Dr. Mechanic (a neurosurgeon he consulted for his back in 2017). LTD 720.[6] He said that what was keeping him out of work was sitting/standing for long periods, traveling to sales calls, and carrying the computer. When asked about his typical day, he said that he tries to walk on the treadmill for 15-20 minutes, does light shopping and prepares meals, and performs his activities of daily life on his own. LTD 721. Finally, he said he was focused on trying to get back to a desk job because he doesn't know that he could travel to clients. LTD 721. During a call in November 2019, Plaintiff confirmed that he was not involved in physical therapy. LTD 742, 744.

In November 2019, First Unum wrote to Dr. Beer, asking him again whether Plaintiff could perform the duties of his regular occupation (listed in the letter) on a full time basis. LTD 737-738. Dr. Beer again said no, and provided the same restrictions and limitations as he had identified in June. *Id.* Dr. Beer also provided his November 2019 office visit note, reporting that Plaintiff's symptoms were "essentially unchanged, but stable." LTD 747. The physical examination of Plaintiff's spine was unchanged from June. LTD 748. Again, Dr. Beer noted that Plaintiff's "plan" was to commence a McKenzie tailored spine stabilization program with a certified therapist and an appropriate postural bias. Once again, no opioids were prescribed. LTD 749.

In December 2019, Janice Albert, R.N. BSN, SrCC, reviewed the medical information available. LTD 793-98. She noted that Dr. Beer's records, as well as pharmacy records "do[] not

---

[6] Plaintiff acknowledged that when Dr. Mechanic reviewed Plaintiff's 2017 MRI of the lumbar spine he concluded that the "diagnostics (MRI) and the exam (symptoms) didn't necessarily conclude any course of action. They left side of my back had bulging disks and my pain was on the right side. He wouldn't operate on me without more consistent information, but he would follow up with me if I chose to." LTD 1091.

indicate the Insured has been taking any pain medications." LTD 796. Nurse Albert concluded that the available medical information did not support that Plaintiff was unable to perform the duties of his regular occupation. LTD 797-99. Among other things, she noted that (1) Plaintiff had a long history of chronic lower back and bilateral shoulder pain, but had demonstrated his overall functional capacity despite his ongoing reported chronic pain; (2) his lumbar MRI was inconsistent with his reported symptoms, because the MRI indicated findings on the left side, but Plaintiff reported pain on the right side; (3) it was unclear why Plaintiff had a Functional Capacity Examination in October 2018, because "there is no indication that there was any change his overall clinical function prior to the FCE as evidenced in the OVN from Dr. Beer dating back to 1/03/17[;]" (4) the FCE did not indicate any specific shoulder complaints, and '[r]ecords from Dr. Beer do not provide any clinical documentation regarding his shoulder function/pain[;]" (5) while a December 2018 shoulder MRI "demonstrate[s] some level of pathology, … it is chronic in nature and does not indicate an[] acute injury[;]" and (6) Plaintiff was not taking any pre-scribed pain medication for his reported pain. *Id*. Nurse Albert concluded: "Dr. Beer has consist-ently indicated the Insured cannot work however there is no clear documentation of any change in his reported symptoms or function at or around his DOD [date of disability]." LTD 798.

Nurse Albert recommended a "Forum with OSP" – a meeting including an on-site physician to review the claim. *Id.* The meeting was held the next day, including Nurse Albert, Wendy Weinstein, M.D., and Renee Chervenak, M.D. LTD 799-800. It was determined that the appro-priate next step was to attempt to speak to Dr. Beer, and then to obtain a written peer review. *Id.*

While the doctor-to-doctor communication was under way, First Unum asked Rusty Peavy, MS, CRC, a senior vocational rehabilitation consultant, "to provide additional information re-garding the travel[]" component of Plaintiff's regular occupation. LTD 802. Mr. Peavy

reported:"[t]he travel can occur via automobile and/or air; however, the frequency cannot be determined as it is based on business need." LTD 802.

On December 6, 2019, Dr. Weinstein, who is board certified in internal medicine, attempted to speak with Dr. Beer, but was unsuccessful; accordingly, she wrote him letter requesting input on Plaintiff's functional capacity. LTD 808-810. Dr. Beer responded, again stating that Plaintiff was not able to perform the demands of his regular occupation on a full time basis, explaining: "The claimant continues to exhibit significant lumbar pain w/reduced ROM. Multiple interventional procedures were only temporarily helpful in alleviating symptoms. Most recent MRI showed extrusion @ L2-3 w/ multiple areas of facet arthropathy chronic residual lumbar pain likely due to facet joint pain." LTD 819.

After receiving Dr. Beer's response, Dr. Weinstein provided a written peer review, LTD 821-824, reporting the following observations and conclusions from the medical records:

- Regarding Plaintiff's "history of chronic low back pain," the 2017 lumbar MRI "showed diffuse disc bulges with central to left disc extrusion at L2-L3 that was not felt to cause significant central canal or neural foraminal stenosis."

- Other than limitations in lumbar range of motion and positive lumbar facet loading, "there have been no other musculoskeletal or neurologic examination abnormalities such as loss of muscle strength, gait abnormality or sensory examination findings that would support an impairment precluding the claimant from performing the noted occupational demands on a full-time basis." LTD 823.

- Dr. Beer's examination notes provided "no clinical correlation to the MRI showing left sided disc extrusion." *Id.*

- The "level of treatment" Plaintiff is receiving "is not consistent with an impairment that would preclude the claimant from performing the listed occupational demands." *Id.* Specifically, he "is currently receiving limited conservative therapy. He attended physical therapy from 2/25/19 to 5/1/19 with improvement in symptoms. … [N]o additional interventional therapy has been scheduled, and he does not take any prescription medication for his symptoms." *Id.*

- Plaintiff's admitted activities – walking on treadmill, light shopping, preparing dinner, carrying luggage while traveling (as noted during March 2019 PT session) – "are not

consistent with a functional impairment that would preclude the claimant from performing the listed occupation demands." *Id.*

- Plaintiff's co-morbid conditions, including hyperlipidemia, type 2 diabetes mellitus, hypertension, obesity, obstructive sleep apnea and shoulder arthritis, "are being treated with medications and are not associated with restrictions and limitations." *Id.*

- Plaintiff "has bilateral shoulder arthritis with tendinopathy. He attended physical therapy for his shoulders from 2/25/19 to 5/1/19 with improvement in symptoms. There is no documentation of any recommended restrictions or limitations related to his shoulder arthritis." LTD 823-824.

Dr. Weinstein concluded that the medical evidence does not support Plaintiff's inability to perform the material and substantial duties of his regular occupation, explaining: "The claimant has chronic stable symptoms with minimal diagnostic and examination findings. He has been receiving limited conservative treatment with no use of pain medication and he has referenced activities that would not support a functional impairment precluding the claimant from performing the listed occupational demands on a full-time basis." LTD 824. Dr. Weinstein recommended a referral to a Designated Medical Officer (DMO) for a second opinion.

Suzanne Sergile, M.D., who is board certified in occupational medicine, performed the DMO, LTD 828-829, and reported: "I am in agreement with [Dr. Weinstein's] assessment that the claimant's reported symptoms and impairment are not consistent with the claimant's exam findings and activity level." LTD 828. Specifically, Dr. Sergile concluded:

> There are no specific physical finings in the medical records furnished that suggest the claimant would be unable to manage the outlined demands due to low back pain. There are no significant abnormalities and no change in examination findings since 06/2019. Additionally, there is no specific treatment other than conservative treatment or any intensified treatment. Thus, this lack of findings is not supportive of the opinion that the claimant is precluded from full-time work with the outlined occupational demands.

LTD 829.

After receiving the peer review and the DMO review, and upon evaluation of all information in the claim file, First Unum notified Plaintiff on January 2, 2020 that it had "completed our

review of your Long Term Disability claim and we will not be able to continue payment of these benefits." LTD 834. The seven-page letter summarized the information it had obtained as well as the peer reviews, and stated: "Your records indicate chronic stable symptoms with minimal diagnostic and examination findings. You are receiving conservative treatment and your records and treatment do not indicate that your conditions rise to level of severity that would prevent you from performing the material and substantial duties of your occupation." LTD 836.

First Unum also terminated Plaintiff's LWOP benefit on January 3, 2020, advising: "Since our Long Term Disability department has determined you are not precluded from performing your own occupational demands, you do not meet the policy definition of disability for Life Insurance Premium Waiver." LWOP 301.

### D. Plaintiff Administratively Appealed, and First Unum Upheld its Determination

Plaintiff appealed First Unum's benefits determination on or about June 30, 2020, and submitted a thirty-one page letter from his attorneys, LTD 1107-1137, as well as 161 pages of supporting material. LTD 1138-1298. Plaintiff argued that his regular occupation should be classified as having a "light" strength requirement, and "it requires many physical activities that Mr. Graziano can no longer fulfill, including frequent travel, prolonged sitting, standing or walking, frequent fine or gross motor movement using bilateral upper extremities; the ability to maintain a set work schedule and meet deadlines; and the ability to sustain attention and concentration." LTD 1107. In support of his appeal, Plaintiff submitted information including:

- An updated FCE from January 2020, which found: Plaintiff was unable to perform his occupation and unable to function even at the sedentary physical demand level. The 2020 FCE noted that "when compared to the [2018] testing, the current testing indicates no significant improvement or change in Mr. Graziano's residual functional capacity…Results were generally consistent. Some scores, particularly those involving right hand fine motor skills and also the pushing task, were significantly lower than prior testing." LTD 1138-73.

- A Residual Functional Capacity Questionnaire, dated May 20, 2020, from Dr. Beer which documented medical conditions limited to the lumbar spine. Dr. Beer noted that Plaintiff

experienced "fatigue, generalized weakness on a daily basis. He also suffers from medica-tion side-effects that cause drowsiness, fatigue, headaches, and cognitive deficits." He con-cluded that Plaintiff could not work due to "significant and chronic pain that inhibit his ability to sit, stand, walk for extended periods and pull, carry or lift." He wrote that "[s]evere pain also interferes with his ability to concentrate, focus and complete tasks re-quiring executive skills, and cognitive functioning." LTD 1174-78.

- A Vocational Assessment, dated May 5, 2020, from Amy Leopold, M.S. Ms. Leopold acknowledged that Plaintiff's occupation most closely relates to the DOT occupation of "Underwriter" (169.267-046). LTD1179-97. However, she opined that, "although Mr. Gra-ziano's work is classified as sedentary, the amount of travel required in his position ele-vates the physical demand level to light work." LTD1191.[7] She also opined that Plaintiff has "less than a sedentary work capacity from both a physical and cognitive standpoint." LTD 1197.

- Various office visit notes and medical records. LTD 1198-1272.

- Witness statements from Plaintiff's friend and his wife, LTD 1273-76, and an affidavit from Plaintiff, LTD 1277-98.

Plaintiff's affidavit is highly illuminating, as it shows that, for years before he stopped work-ing, he complained of worsening pain but with minimal treatment. Thus, after experiencing back pain since 2010 (LTD 1281-85), Plaintiff claimed he had a dramatic episode in the subway "at the end of 2017" that resulted in him "stay[ing] down [on the ground] for over 30 minutes" and "crawling" part of the way home. LTD 1285. But there are few, if any, medical records from that time period, other than a lumbar MRI with findings typically described in the report as "diffuse," "minimal," "mild," or "moderate," or "no[t] significant." LTD 179-180. Plaintiff admitted that, according to Dr. Mechanic, the neurosurgeon he consulted in 2017, the MRI did not explain his symptoms because "the left side of my back had bulging disks and my pain was on the right side." LTD 1286. Plaintiff continued to work.

---

[7] Ms. Leopold's use of vague terms like "work" and "position" instead of the relevant term "occupation as it is nor-mally performed in the national economy," undercuts the relevance of her assertion about travel "elevating" the physical demands of Plaintiff's "position." Ms. Leopold reviewed the LTD Policy as part of her analysis, LTD 1179, so it would appear that her decision to use non-policy terms was intentional.

More significantly, the affidavit essentially admits that the long commute from West Islip to Manhattan, which was imposed by a new boss, was the critical factor in his decision to stop working in October 2018. Specifically, in the end of 2017, Plaintiff's team leader "agreed I could work 4 days a week from home [in West Islip] and one day in the office [in Manhattan]." LTD 1287-88. In 2018, however, his new team leader insisted that he work in the New York City office four days a week. LTD 1289. Plaintiff asserted that this required "a long typical commute from Long Island to Manhattan and back," LTD 1279, and that he was "having trouble … commuting[.]" LTD 1289. He also complained of spending "many hours a day" inputting information into "new systems." LTD 1288.

By October 2018 Plaintiff asserted, "the wear and tear of the commute … left my back stiff and weak[.] … Now I was having a hard time getting out of the house early for my commute to the office[.]" LTD 1290-1291. He continued: "my last day at the NYC Swiss Re Offices (Friday, Oct 12th) resulted in another difficult commute home wherein I had to crawl on the subway floor before I could stand up." LTD 1291. The next day, Plaintiff "***went straight to the offices of Dr. Beer and … told him I could not do my job anymore***[.]" LTD 1291 (emphasis added). He said Dr. Beer "agreed that I needed to stay home[.]" LTD 1291-92.

During an initial discussion among the appeal specialist, Katie Doherty; a vocational consultant, Kelly Marsiano; Elizabeth Israel, R.N.; and Scott B. Norris, M.D. (LTD 1714-17), it was noted that Plaintiff "has submitted on appeal a voc report and has also outlined his disagreement with the OI [Occupational Information] stating occ is light and not sedentary duty." LTD 1716. Ms. Marsiano "commented that occ is sedentary" and stated that she would update the occupational information to assess the cognitive demands. *Id.*

Ms. Marsiano provided that updated vocational review, in which she described the cognitive demands of Plaintiff's occupation as including: (1) attaining precise set limits, tolerances, and standards; (2) dealing with people; and (3) making judgments and decisions. *Id.* She concluded that the occupation was considered skilled. LTD 1718.

Next, Scott B. Norris, M.D., M.P.H., who is board certified in Family Medicine, Occupational Medicine and Aerospace Medicine, reviewed the available evidence and issued a peer review report, LTD 1728-1735, which included the following observations and conclusions:

- Plaintiff reported low back pain as early as 2012, and received various types of conservative treatment and lumbar injections prior to his reported date of disability.

- Lumbar imaging showed mild to moderate multilevel degenerative changes without evidence of severe nerve root impingement or spinal canal narrowing.

- Plaintiff participated in physical therapy for his back and shoulder from February through May 2019, and reported no significant improvement of his symptoms. Notes from May 2019 noted minimally to moderately limited passive shoulder range of motion bilaterally. Although Dr. Beer reported additional physical therapy, Plaintiff told First Unum in October 2019 that he was not in physical therapy.

- Plaintiff did not see Dr. Beer from June 2019 through November 2019, an interval that was not consistent with ongoing impairment or progressive symptoms. Moreover, Plaintiff was not referred to a spine surgeon for ongoing low back pain, which would be expected if there was significant concern about progressive or refractory disease or related impairment.

- Plaintiff was not prescribed, and did not fill, medications for pain in 2019 or 2020 other than escitalopram (an antidepressant) prescribed since 2013. Plaintiff did not report impairing medication side effects in contemporaneous medical exams, and examination reports did not describe sleepiness, drowsiness, sedation, psychomotor agitation/retardation, or other function deficits related to medication use.

- Though Plaintiff's appeal claimed a disabling hip condition, the medical records did not indicate any report of hip pain, and there were no imaging of the hips or specific findings suggestive of significant hip pathology. The medical records did not support functional impairment related to a hip condition.

- Regarding cognitive difficulties, there was no treatment with a behavioral health provider, and no support for a behavioral health impairment.

First Unum asked Dr. Norris to advise whether, from January 3, 2020 through the date of his review, "the reported existence, severity, duration and frequency of the reported signs and symptoms [are] consistent with the underlying injuries/illnesses and other documentation in the file[.]" LTD-1733. Dr. Norris answered "no," and explained that Plaintiff "reported severe functional impairment primarily due to low back and shoulder pain. The limited examination findings by treating APs were not c/w [consistent with] the severe level of impairment reported by [Plaintiff]." *Id.* He continued: "The intensity of treatment for back and shoulder conditions remained of very low intensity as of June 2019 forward and was not c/w the severity of impairment as reported by [Plaintiff]." LTD 1733-34. Dr. Norris considered "the whole person," and concluded that the medical information did not preclude full-time work capacity in his regular occupation. LTD 1734.

Dr. Norris also expressly disagreed with the conclusions of Plaintiff's FCEs, explaining: "FCE report in Jan 2020 concluded that the EE had less than sedentary capacity and that there was no significant change compared to the prior FCE in 2018. FCE findings were inconsistent with examinations by other providers. The hip dysfunction and the marked grip/pinch/and fine motor weakness noted in the FCE were not c/w the unremarkable evaluations by treating providers and the absence of reported sxs related to the hips or hands." LTD 1734.

He also expressly disagreed with Dr. Beer's restrictions, finding them "significantly out of proportion to the modest findings on examinations/diagnostics and the low intensity of conservative management as of 2019 forward." LTD 1734. Dr. Beer's opinion that Plaintiff "suffered from drowsiness and impairing cognitive deficits due to medication side effects is not supported by the medical records, especially considering that the EE has not been prescribed or filled

medications for pain in 2019 or 2020 per pharmacy report in 2019 and OV notes in 2020, and the insured did not report impairing medication side effects at contemporaneous OVs." *Id.*

Regarding Plaintiff's functional capacity, Dr. Norris concluded: "the occupation allows for changes in position. Due to the EE's OA [osteoarthritis] and tendinopathy of the shoulders, supported R/Ls include less than occasional reaching above shoulder level, occasional reaching to shoulder level, and up to frequent reaching at desk level." *Id.*

Because Dr. Norris endorsed limited restrictions regarding Plaintiff's shoulders, First Unum asked Shannon O'Kelley, M.Ed., CRC, CEAS, to evaluate the claim. She determined that Plaintiff's regular "occupation can be performed with [those] restrictions and limitations[.]" LTD 1737.

On August 11, 2020, First Unum provided Dr. Norris' peer review and the new vocational reviews to Plaintiff's attorney, advising that "we have considered new information and/or rationale developed on appeal which appears to support the decision." LTD 1758-59. First Unum stated that Plaintiff had a right to review and respond to the new information, and that he must respond by August 26, 2020. *Id.* First Unum subsequently agreed to Plaintiff's request to have until September 25, 2020 to respond. LTD 1760, 1762.

On September 25, 2020, Plaintiff submitted a response, which included a September 16, 2020 letter from Dr. Beer, August/September 2020 records from Dr. Beer and Dr. Marzec, physical therapy prescriptions from Dr. Marzec, and September 2020 MRIs of the lumbar spine and left hip. LTD 1768-91.

The September 2020 lumbar MRI report was largely comparable to the October 2017 lumbar MRI, in that the findings in both were "mild" or "moderate." *Compare* LTD 179-180 (October 2017 lumbar MRI while Plaintiff was working full time) with LTD 1788 (September 2020

MRI, 9 months after benefits were terminated). The hip MRI was an "Unremarkable MRI of the left hip joint, without significant labral tear or degenerative change." LTD 1790.

Plaintiff also submitted an addendum vocational report from Ms. Leopold, which asserted that Plaintiff's "work demanded that he be reliably available to travel to potential and existing clients. Mr. Graziano was required to travel locally and nationally approximately 100 times annually." LTD 1773. Again, Ms. Leopold, who knew how the LTD Policy defined "regular occupation," chose to use the term "work," presumably to refer to Plaintiff's job at Swiss Re, rather than his "occupation as it is normally performed in the national economy instead of how the work tasks are performed for a specific employer or at a specific location." LTD Policy 33.

Similarly, Dr. Beer's letter acknowledged that Plaintiff had received only conservative treatment for his lumbar spine, and contended: "Just because Michael does not take pain medications does not mean that his condition is not severely disabling." LTD 1776-77.

Upon receipt of Plaintiff's additional information, First Unum referred it back to Dr. Norris. LTD 1801-1803. Dr. Norris summarized the new clinical records as follows:

> As noted in my prior review, the EE reported severe functional impairment primarily due to low back and shoulder pain. In Sep 2020, he was also evaluated for L hip pain. Updated records showed limited examination findings by treating APs to include reduced shoulder ROM c/w advanced OA. Other exam findings included lumbar spasm w/ reduced ROM and chronic reduction of ankle reflexes; however, upper and lower extremity motor strength/sensation and gait remained normal.

LTD 1803. He then summarized the new hip and spine MRIs:

> Updated diagnostics showed normal L hip w/ low-grade tear and tendinosis of the hamstring's tendon. Updated lumbar MRI showed chronic moderate multilevel degenerative changes with some progression since a 2017 study. Nerve root impingement at L2/3 was noted; however, there were no corresponding L2 myotomal/dermatomal motor or sensory changes suggestive of significant LE functional impairment, and there was no reduction in the L patellar reflex to suggest significant functional compromise of the L2 root. Furthermore, the EE denied radicular pain (OV, 8/27/20) of either lower extremity.

*Id.* Then he described Plaintiff's treatment:

The additional records continue to describe ongoing conservative treatment. Although referred to PT on at least three additional occasions (Aug and Sep 2020), records do not indicate that EE pursued therapy. If severe, refractory, and progressive pain and functional impairment were ongoing, compliance with PT would be expected. He also declined surgical intervention for his shoulders. The additional records do not indicate that the EE requested or took pain medications.

*Id.* Finally, Dr. Norris found that the FCE was still inconsistent with clinical reports: "Updated examinations in Aug/Sep 2020 described normal upper/lower extremity strength, which showed ongoing inconsistency with the Feb 2020 FCE description of hip dysfunction and the marked grip/pinch/and fine motor weakness." *Id.* As a result, Dr. Norris reported: "In consideration of the additional information received and the information previously reviewed, my opinion as stated in the 8/5/20 review remains unchanged." *Id.*

First Unum also asked Ms. O'Kelley to review and advise on Plaintiff's additional vocational documents. LTD 1805-09. Ms. O'Kelly concluded that "[a] review of the DOT information for the occupation of Underwriter (DOT 169.267-046) did not provide any occupational tasks which would require travel." *Id.* Ms. O'Kelly rejected Ms. Leopold's reliance on a different resource, O*NET, stating that "O*NET is a tool used for occupational exploration and is not generally used in the disability determination[.]" *Id.* Even so, she concluded that "[t]he tasks outlined in the O*NET also did not include tasks which would require travel." *Id.*

On October 14, 2020, First Unum gave Plaintiff another opportunity to review and respond to these medical and vocational addenda. LTD 1822-1823. Plaintiff requested, and First Unum approved, an extension to November 2, 2020. LTD 1827.

On November 2, 2020, Plaintiff submitted a letter from Dr. Beer and a copy of Plaintiff's physical therapy records. LTD 1833-42. Dr. Beer's letter did not discuss or include any medical records that had not been previously reviewed by Dr. Norris; instead, he merely expressed his disagreement with Dr. Norris' analysis. LTD 1835-36. Dr. Beer did not dispute the assertion that

Plaintiff did not have physical therapy, but stated that "it would have been foolhardy for Mr. Graziano to attend physical therapy during the height of the pandemic[.]" LTD 1836. The physical therapy records consisted of an "initial examination" on October 28, 2020 regarding an "Injury/Onset/Change of Status" that occurred on May 18, 2020. LTD 1840.

On November 10, 2020, First Unum issued a twelve-page letter upholding its decisions to terminate LTD and LWOP benefits as of January 2020. LTD 1847-1858. The letter summarized the January 2020 adverse benefits determinations and the evidence supporting them (LTD 1847-48), Plaintiff's appeal and First Unum's evaluation of that appeal, including the conclusions reached by Dr. Norris and Ms. O'Kelly (LTD 1849-52), and First Unum's disclosure of any new information and/or rationales to Plaintiff, his response, and its evaluation of that response (LTD 1852-54).

The letter expressly noted that the addenda prepared by Dr. Norris and Ms. O'Kelly were provided to Plaintiff for further review and response, and that Plaintiff responded with his November 2, 2020 submission. LTD 1854. The letter stated that Dr. Beer "outlined his disagreement with the opinion of" Dr. Norris. In response to Dr. Beer's assertion that the COVID pandemic interfered with Plaintiff's ability to pursue physical therapy, First Unum responded by "not[ing] that the relevant timeframe related to your client's benefits is January 3, 2020, which is prior to the pandemic." *Id.*[8] The letter stated that "[T]here was no new medical data submitted for consideration dating back to the relevant time period of January 3, 2020 upon which to base a further medical review on appeal." LTD 1855.

---

[8] *See Phillips v. Aetna Life Ins. Co.*, 2021 WL 5449289 (D. Minn. Nov. 22, 2021) (finding not credible plaintiff's argument that he was afraid to participate in the insurer's neuropsychological examination due to COVID, when the examination was scheduled for February 21, 2020, several weeks before any stay-home orders).

The letter concluded: "On appeal, we have fully and fairly considered the issues and concerns you raised. Based on our review, the decision to deny benefits on your client's claims were appropriate. The information in the claim file supports that he can perform the duties of his regular occupation. He is not eligible for further benefits." LTD 1855.

## E.     The 2021 SSDI Determination Is Irrelevant

In August 2021, nine months after Plaintiff exhausted administrative remedies in November 2020, and after Plaintiff had already filed suit, the Social Security Administration ("SSA") issued a Notice of Decision finding that Plaintiff had been under a disability "as defined in the Social Security Act since October 15, 2018…" SSDI 1-8. However, as set forth below, the SSDI award has no bearing on this case because (1) the decision is not part of the Administrative Record, because it had not been – and could not have been - provided to First Unum at the time it made its final determination; (2) the SSA agreed with First Unum's determination that Plaintiff had the "functional capacity to perform sedentary work," which is the classification First Unum concluded was appropriate for his occupation; and (3) the SSA's determination  was based in part on consideration of Plaintiff's age, pursuant to 20 C.F.R. 404.1563, while the Plan does not modify the definition of disability based on the claimant's age.

## <u>ARGUMENT</u>

## I.     The Court Should Review First Unum's Determination Under the De Novo Standard of Review

The Parties agree that the Court should apply the *de novo* standard of review in this case. "When applying the de novo standard of review, the Court reviews all aspects of the denial of an ERISA claim, including fact issues." *McDonnell v. First Unum Life Ins. Co.*, No. 10 CV 8140 RPP, 2013 WL 3975941, at *11 (S.D.N.Y. Aug. 5, 2013). "As a result, the reviewing court gives no deference to the administrative interpretation of the plan documents or its conclusion

regarding the merits of the claim, but rather reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, entitlement to benefits under the plan." *Curtis v. Aetna Life Ins. Co.*, No. 3:19-CV-01579, 2021 WL 1056785, at \*7 (D. Conn. Mar. 18, 2021).

Thus, "the Court stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *McDonnell*, at \*11.

## II.    First Unum Complied with Section 503-1 and Provided a Full and Fair Review

Plaintiff contends that First Unum denied him a full and fair review, arguing that 29 C.F.R. §2560.503-1(h)(3)(iii) required it to ask a health care professional to review two pieces of evidence that Plaintiff submitted in November 2020. Pl. Br., p. 11. Plaintiff's argument in this regard is legally and factually baseless, and should be rejected.

First, Plaintiff is wrong when he argues that, if First Unum did not strictly adhere to Section 503-1, its "determination must be overturned." Pl. Br., p. 11. Plaintiff cites *Cook v. New York Times Co. Long-Term Disability Plan*, No. 02 CIV. 9154 (GEL), 2004 WL 203111 (S.D.N.Y. Jan. 30, 2004), for that proposition, but *Cook* does not so hold. In fact, *Cook* rejected that precise argument: "[T]he remedy for the fiduciary's failure is not, as plaintiff argues, automatic entry of judgment in favor of the insured – in effect treating defendant's noncompliance as a ground for default – but rather, an opportunity for the insured to fully and fairly present his or her claim." *Id.* at \*19. Section 503-1(l)(2)(i) provides that a failure to strictly adhere to the regulation results in the claim being "deemed denied on review without the exercise of discretion by an appropriate fiduciary." Section 503-1(l)(2)(i). Such a "deemed denial" would, in turn, result in *de novo* review. *Halo v. Yale Health Plan*, 819 F.3d 42, 60 (2d Cir. 2016) ("a plan's failure to comply with

23

[Section 503-1] will result in that claim being reviewed *de novo* in federal court[.]"). But because the parties here agree that the Court will conduct a *de novo* review, a finding that First Unum did not comply with the Regulation does not impact the Court's evaluation.

Nonetheless, the Administrative Record shows that First Unum did strictly adhere to Section 503-1. There are two subsections of 29 C.F.R. § 2560.503-1 ("Section 503-1") that are relevant to Plaintiff's argument. First, Section 503-1(h)(3)(iii) – which applies to group health plans, but is made applicable to "plans providing disability benefits" by Section 503-1(h)(4) – states: "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, … the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." There is no question that First Unum consulted with Dr. Norris on Plaintiff's administrative appeal. LTD 1728-1735. Therefore, it complied with Section 503-1(h)(3)(iii).

Plaintiff's legal argument really centers around a different subsection of Section 503-1, which he does not cite in his brief. Specifically, Section 503-1(h)(4)(i), which applies only to plans providing disability benefits, states that, before issuing an adverse benefit determination on review, a claim fiduciary must disclose "any new or additional evidence considered, relied upon, or generated" with sufficient time "to give the claimant a reasonable opportunity to respond" prior to the deadline for deciding the appeal. Section 503-1(h)(4)(ii) has a virtually identical provision applying to "a new or additional rationale" developed on appeal.

When First Unum provided the first reports from Dr. Norris and Ms. O'Kelly to Plaintiff's attorney in August 2020, it was expressly complying with Section 503-1(h)(4). LTD 1758-59 ("we have considered new information and/or rationale developed on appeal which appears to support the decision" on appeal). Plaintiff responded to that disclosure in September 2020. LTD

1768-91. First Unum concluded that the new information merited further review, and it asked Dr. Norris and Ms. O'Kelly to advise whether the new information changed their opinions; they both concluded that it did not. LTD 1801-03, 1805-09.

First Unum then disclosed the addenda reports prepared by Dr. Norris and Ms. O'Kelly in October 2020. LTD 1822-23. This time, Plaintiff's November 2020 response did not contain information that required further medical review. Whereas Plaintiff's September response had included new medical records from Dr. Beer and various other doctors, as well as MRI reports (LTD 1768-91), Plaintiff's November response had no new medical records from Dr. Beer, just his letter expressing his disagreement with Dr. Norris' analysis. LTD 1835-36. Evaluating a letter of advocacy, even from a doctor, does not require a medical degree. Similarly, medical expertise was not required to conclude that physical therapy records from October 2020 regarding a new "Injury/Onset/Change of Status" that occurred in May 2020 (LTD 1840) did not have information pertinent to Plaintiff's condition or functional capacity in January 2020.

The Department of Labor addressed exactly this type of situation in its Preamble to the 2016 amendment to Section 503-1 that added Section 503-1(h)(4). 81 Fed. Reg. 92316 (Dec. 19, 2016). In particular, the DOL addressed arguments by commentators that "giving claimants new or additional evidence or rationales developed during the pendency of the appeal and requiring plans to consider and address claimant submissions regarding the new or additional evidence or rationale would set up an unnecessary cycle of review and re-review leading to delay and increased costs." *Id.* at 92325. The DOL responded that: "[i]f a claimant's assertions do not include new factual information or medical diagnoses, a plan need not generate report after report rather than relying on the reports it already has in hand merely because a claimant objects to or disagrees with the evidence or rationale." *Id.* at 62326. The Second Circuit has held that the DOL's

25

"interpretation of its own regulation as contained in the regulation's preamble is entitled to substantial deference[.]" *Halo*, 819 F.3d at 53.

The DOL's preamble encapsulates precisely what occurred here. Whereas Plaintiff submitted new medical information in September 2020, his November 2020 submission did not contain new medical information pertaining to the time period at issue. Thus, First Unum properly advised Plaintiff that his November 2020 submission contained "no new medical data submitted for consideration dating back to the relevant time period of January 3, 2020 upon which to base a further medical review on appeal." LTD 1854-1855.

Plaintiff contends that First Unum should have asked Dr. Norris to respond to his information because Dr. Beer asserted that Plaintiff's spine condition resulted in limitations for sitting. Pl. Br., p. 13. But Dr. Norris expressly considered whether all of Plaintiff's conditions would have prevented him from the functional capacity required for his occupation, which expressly included "mostly sitting, may involve standing of walking for brief periods of time; … able to change positions for brief periods of time throughout the day[.]" LTD 1734. Dr. Norris expressly answered that Plaintiff's condition would not have precluded that functional capacity. *Id.* No medical judgment is required to conclude that Dr. Norris most certainly did consider what Dr. Beer claimed he did not consider.

Accordingly, the Court should conclude that First Unum complied with Section 503-1 and provided Plaintiff with a full and fair review of his claim. Even if it did not, it does not change Plaintiff's burden of proof.

## III.    Plaintiff Must Prove by a Preponderance of the Evidence that He is Disabled Within the Meaning of the Plan As of January 3, 2020

In order to establish entitlement to benefits, a plaintiff must "prov[e] by a preponderance of the evidence that he is totally disabled within the meaning of the plan." *Paese v. Hartford Life*

*& Acc. Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Critchlow v. First Unum Life Ins. Co. of Am.*, 378 F.3d 246, 256–57 (2d Cir. 2004) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, … and these principles too are applicable in ERISA cases.").

Plaintiff's burden does not shift or change due to the fact that he received benefits for a period of time. The Plan does not contain any term providing that a disability claim, once approved, must be continued, or that the burden of proof otherwise shifts. To the contrary, the Plan clearly provides that the burden remains on Plaintiff. Among other things, it says that First Unum "will stop sending you payments and your claim will end on the earliest of the following: … the date you are no longer disabled under the terms of the plan[;] … the date you fail to submit proof of continuing disability[.]" Maddox Aff., Ex. 4, p. 22. Case law confirms that Plaintiff retains the burden to prove that he qualifies for continued benefits. *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134, 2008 WL 169318, at *9 (S.D.N.Y. Jan. 17, 2008) ("To the extent that Plaintiff argues that the past payment of benefits resulted in a shifting of the burden to the Defendants, Plaintiff is incorrect. There is nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits.").[9]

### A. The Preponderance of the Evidence Confirms that First Unum Correctly Determined Plaintiff Was Not Disabled as Defined by the Plan as of January 2020

The Administrative Record establishes several issues without question:

- Plaintiff has a chronic lower back condition, dating back to 2010, and Plaintiff worked for nine years at Swiss Re with that back condition.  LTD 127, 1279, 1281.

---

[9] *See also*, *Tretola v. First Unum Life Ins. Co.*, 2015 WL 509288, at *22 (S.D.N.Y. Feb. 6, 2015) ("Tretola must demonstrate, by a preponderance of the evidence, that she was disabled as of February 14, 2012, to be entitled to disability benefits under the First Unum policy. The fact that Tretola had been judged to be disabled, as of April 2009…does not shift the burden of proof from Tretola to First Unum."); *Lee v. Aetna Life & Cas. Ins. Co.*, No. 05 CIV. 2960 (PAC), 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2007) ("Aetna is not required to disprove the possibility that Lee was disabled in order to terminate her benefits; rather, it is Lee's burden to demonstrate her disability under the Plan.").

- Plaintiff consistently received only conservative treatment for his back. In particular, he did not take pain medication during the relevant time, and generally refused to pursue physical therapy prior to the termination of benefits (other than a 3 month period in early 2019).

- MRIs do not reveal a spine condition severe enough to warrant surgical intervention. Plaintiff acknowledged that when Dr. Mechanic, a neurosurgeon he consulted, reviewed Plaintiff's 2017 lumbar MRI, he concluded that the "diagnostics (MRI) and the exam (symptoms) didn't necessarily conclude any course of action. The left side of my back had bulging disks and my pain was on the right side. He wouldn't operate on me without more consistent information, but he would follow up with me if I chose to." LTD 1091. Plaintiff chose not to follow up with Dr. Mechanic.

### 1. The Medical Evidence Does Not Establish Disabling Restrictions and Limitations Due to a Back Condition

There is no dispute that Plaintiff's 2017 and 2020 lumbar MRIs revealed various defects at different levels, which the reviewing radiologists typically characterized as "diffuse," "minimal," "mild," or "moderate," or "no[t] significant." LTD 179-180, 1788. Dr. Beer's physical examinations were typically negative, with the exception of reduced Achilles reflexes, limited lumbar range of motion, and positive lumbar facet load testing. LTD-659. Dr. Beer did not contend that any of these positive findings physically prevented Plaintiff from sitting for extended periods, or engaging in any other work-related activities. *See Pellegrino v. First Unum Life Ins. Co.*, No. 1:20-CV-484, 2021 WL 3912238, at *9 (N.D.N.Y. Sept. 1, 2021) ("the mere fact that Pellegrino has been diagnosed with certain prior or ongoing health conditions does not itself establish continued disability[.] … Instead, the relevant question … is whether plaintiff's functional capacity continues to" disable him under plan terms.).

Thus, the issue is whether Plaintiff's lumbar spine caused pain that was severe enough to restrict Plaintiff from performing the material and substantial duties of his regular occupation. There is no dispute that pain is entirely subjective, and there is no way for anyone – a treating doctor, a claim fiduciary, or a court – to measure the pain that a person is actually experiencing during the relevant time period. There is also no dispute that subjective evidence, such as

symptoms of pain, *can* be sufficient to establish a disability, but it is critical to remember that the possibility that pain might be disabling "does not mean the plan administrator [or court] has to accept without question the degree to which an individual's subjective experience of pain limits their objective functional capacity." *Pellegrino*, 2021 WL 3912238, at *11.

In evaluating disability claims based on a subjective complaint like pain, two issues are critical: (1) whether the complaints are credible; and (2) whether there is objective evidence that the symptoms limit functional capacity enough to be disabling. Regarding the first issue, it is well-established that "a district judge is not required to accept a plaintiff's subjective complaints as credible[.]" *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 101–02 (2d. Cir.2003); *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) ("a district court reviewing an administrator's decision *de novo* is not required to accept such complaints [of pain] as credible").

Regarding the second issue, "a distinction exists between the amount of fatigue or pain an individual experiences, which is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009). Thus, "it is not unreasonable for ERISA plan administrators [or courts] to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability." *Hobson*, 574 F.3d at 88; *Tortora v. SBC Comms., Inc.*, 739 F.Supp.2d 427, 444 (S.D.N.Y.2010) ("Sedgwick was not required to accept Tortora's subjective complaints in the absence of objective evidence supporting disability.").

Here, there are multiple reasons to conclude that a preponderance of the evidence does not support a conclusion that Plaintiff's subjective complaints were severe enough to prevent him from performing the duties of his regular occupation.[10]

*First*, as discussed above, Plaintiff was not taking pain medication (or pursuing any aggressive treatment), which is not consistent with pain so severe to be disabling. *Bumpas v. Unum Life Ins. Co. of Am.*, No. 803-CV-2105T27-TGW, 2005 WL 2428537, at *5 (M.D. Fla. Sept. 30, 2005) (upholding denial of claim due to "severe back pain" on *de novo* review where, *inter alia*, "No … medication was ordered by any physician[.]"); *Jeter v. Comm'r of Soc. Sec. Admin.*, 76 F. App'x 809, 811 (9th Cir. 2003) (upholding denial of SSDI where "the lack of prescription of strong pain medication, and other discrepancies" supported finding that plaintiff's "statements regarding his impairments and their impact on his ability to perform work lacked credibility[.]").

Plaintiff's response to this is Dr. Beer's remark in an advocacy letter submitted on appeal: "Just because Michael does not take pain medications does not mean that his condition is not severely disabling." LTD 1777. Though Dr. Beer is entitled to his opinion, the Court is not obligated to accept it, and it should not accept it, because it is more likely that a person who does not take pain medications and does not pursue more aggressive treatment is not experiencing pain severe enough to be disabling.

*Second*, Plaintiff's assertion that his symptoms progressed enough after 2010 to disable him as of 2020 is lacking. Plaintiff describes back pain starting in 2010, and gradually worsening over years but not interfering with his job. LTD 1281-85. Then, he contends that he had a dramatic episode in the subway "at the end of 2017" that resulted in him "stay[ing] down [on the

---

[10] Likewise, because the preponderance of the evidence establishes that Plaintiff is not unable to perform the material and substantial duties of his own occupation, he also cannot establish that he is unable to perform the duties of any gainful occupation, and therefore cannot meet the definition of disability under the LWOP Policy.

ground] for over 30 minutes" and "crawling" part of the way home. LTD 1285. There are few medical records from that time, other than the 2017 MRI, with its largely "diffuse," "minimal," "mild," or "moderate," or "no significant" findings. LTD 179-180. As Plaintiff acknowledges, Dr. Mechanic, the neurosurgeon he consulted in 2017, said that the MRI did not explain his symptoms because "the left side of my back had bulging disks and my pain was on the right side." LTD 1286. And Dr. Beer's records reflect that he assessed Plaintiff with "facet syndrome (M47.899) and lumbago (M54.5)" as early as January 2017 (well before the subway incident) through August 2020. LTD 160-173; 1779. There is no dispute that Plaintiff kept working for more than a year after that episode.[11]

*Third*, none of Plaintiff's doctors told him that he should stop working – it was Plaintiff's decision. More particularly, the evidence shows that Dr. Beer did not recommended that Plaintiff stop working, but rather accepted Plaintiff's assertion that he "could not do [his] job anymore" after his new boss required him to commute more frequently from West Islip to New York City. LTD 1291. The fact that Dr. Beer accepted that assertion and then supported Plaintiff's claim does not merit any substantial weight, because treating doctors have biases and/or incentives to support a patient's decision to stop working . *See Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 832 (2003) ("a treating physician, in a close case, may favor a finding of 'disabled.'"); *Napoli v. First Unum Life Ins. Co.*, 2005 WL 975873 at \*4 (S.D.N.Y. Apr. 22, 2005) ("a treating physician … has every incentive – psychological, moral and even, in view of the risk of malpractice liability, financial – to take the most conservative possible view of [his patient's] prognosis

---

[11] It was reasonable for First Unum initially to give him the benefit of the doubt and begin paying benefits for a period of time while it awaited additional evidence from Plaintiff's physical therapy. First Unum does not seek to recover those benefits, even if, with the benefit of hindsight, it might have been correct to conclude that Plaintiff did not qualify for them.

and treatment."). Put another way, Plaintiff's complaints of disabling pain do not automatically become credible because his treating doctor accepted them.

*Fourth*, Plaintiff's affidavit on administrative appeal contains substantial evidence that the real reason he stopped working (or at least a very significant factor) was his commute from West Islip to Manhattan, and the fact that his new boss required him to make that commute four days a week instead of the one day a week his previous boss had allowed. Plaintiff affirmatively states that he never returned to the Swiss Re office in Manhattan after a "difficult commute home" on October 12, 2018. LTD 1291.

The LTD Policy expressly provides that a claimant's commute to a particular employer or job site is not relevant to a disability claim, by including in the definition of "Regular Occupation" the statement that First Unum will not consider "how the work tasks are performed for a specific employer or at a specific location. LTD Policy 33. Moreover, Plaintiff cannot establish that commuting from West Islip to Manhattan four days a week is a "material and substantial duty" of the occupation of Underwriter.  Case law is in agreement. "It is clear that a claimant's commute to a particular job site is not a consideration for determining disability." *Nelson v. Unum Life Ins. Co. of Am.*, 421 F. Supp. 2d 558, 568 (E.D.N.Y. 2006), *aff'd*, 232 F. App'x 23 (2d Cir. 2007); *Onge v. Unum Life Ins. Co. of Am.*, No. 3:07CV01249 AWT, 2010 WL 3802787, at *4 (D. Conn. Sept. 20, 2010); *Adams v. Prudential Ins. Co. of Am.*, 280 F.Supp.2d 731, 739 (N.D.Ohio 2003) ("[t]he Court is unpersuaded by [the plaintiff's] argument that his inability to travel to and from work is a material and substantial duty that Defendant must consider"); *Chandler v. Underwriters Lab.*, 850 F.Supp. 728, 738 (N.D.Ill.1994) ("the fortuity of where an employee lives (something within the employee's control, unlike a truly medical disability) is not relevant to a finding of disability under the Plan").

First Unum's clinical and peer reviewers considered all of the medical evidence available to them at the times of their reviews, and uniformly (and correctly) concluded that the evidence did not support the conclusion that any of Plaintiff's claimed complaints (alone or in combination) limited his functional capacity sufficiently to disable him. Specifically:

- Janice Albert, R.N. noted the left-sided MRI findings did not explain right-sided pain, as well as the absence of pain medication, and concluded that "there is no clear documentation of any change in [Plaintiff's] reported symptoms or function at or around his" date of disability. LTD-798.

- Wendy Weinstein, M.D. (internal medicine) found limited "musculoskeletal or neurologic examination abnormalities," and concluded that Plaintiff "has chronic stable symptoms with minimal diagnostic and examination findings. He has been receiving limited conservative treatment with no use of pain medication and he has referenced activities that would not support a [disabling] functional impairment[.]" LTD 824.

- Suzanne Sergile, M.D. (occupational medicine), observed a lack of "significant abnormalities and no change in examination findings since 06/2019[,]" as well as only "conservative treatment" that was not intensified post-disability, and concluded "this lack of findings is not supportive of the opinion that the claimant is precluded from full-time work with the outlined occupational demands." LTD 829.

- Scott Norris, M.D., (family medicine, occupational medicine and aerospace medicine) noted limited findings on examination, a lack of pain medication, and concluded that the "limited examination findings" and the "intensity of treatment" were not consistent with "the severity of impairment as reported by [Plaintiff]." LTD 1733-34.

The mere fact that Dr. Beer, a treating doctor, had a different opinion, is not sufficient to overcome the contrary evidence in the Administrative Record identified by the peer reviewers, or the conclusions of those peer reviewers. *Nord*, 538 U.S. at 834 (plan administrators are not required to "accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").[12]

---

[12] In a related point, Plaintiff repeatedly asserts that First Unum did not have him examined by a doctor of its own choosing, but he does not explain how an independent medical examination might have provided more information about his condition than was apparent from MRI reports, Dr. Beer's office notes and letters, and the other material in the file. Moreover, the Second Circuit has upheld "the commonplace practice of doctors arriving at professional opinions after reviewing medical files, which reduces the financial burden of conducting repetitive tests and

As *Pellegrino*, 2021 WL 3912238, at *11, held: "Pellegrino's challenge to the termination of his LTD benefits boils down to a contention that Dr. Do Ouro's opinion about, and his own self-reports of, significant functional limitations necessarily outweigh any conflicting findings of lesser severity assessed by Dr. D'Ambrosio and generally supported by other substantial evidence in the voluminous record. That is not the law."

Moreover, when considering Dr. Beer's views, the Court should give little or no weight to his letters advocating for LTD benefits, and more weight to his actual treatment records, which offer little, if any, support for Plaintiff's claim. *Dramse v. Delta Family-Care Disability & Survivorship Plan*, 269 Fed. App'x 470, 480 (5th Cir. 2008) (affirming denial of benefits where administrator gave less weight to treating doctor's advocacy letter "because [the letter] was unsupported by [the doctor's] contemporaneous notes"); *Louis v. Genworth Life & Health Ins. Co.*, 2008 WL 4450264 at *8 (D. Mass. Sept. 30, 2008) (contemporaneous reports made for the purpose of diagnosis and treatment more probative than subsequent, contrary opinion); *Schleicher v. Ascension Health*, 2006 WL 686374 at *12 (M.D. Tenn. Mar. 17, 2006) (where treating doctors' later advocacy conflicted with contemporaneous treatment records, administrator reasonably determined that doctors acted "for the purpose of assisting [claimant] in gaining LTD benefits" and for that reason "opted to afford very little weight or no weight to them"); *Bumpas v. Unum Life Ins. Co.*, 2005 WL 2428537 at *5 (M.D. Fla. Sept. 30, 2005) (finding administrator was correct "to rely on contemporaneous treatment notes of [claimant's] physicians, rather than [their] post hoc certification of disability").

Plaintiff's attacks on Dr. Norris should not be countenanced by the Court, for several reasons. First, Dr. Norris was one of three doctors who reviewed the medical evidence in the claim,

examinations." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91 (2d Cir. 2009).

and his assessment and conclusions were consistent with those of Drs. Weinstein and Sergile.

Second, the fact that some other court found Dr. Norris' analysis of some other claim to be not

dispositive does not provide any insight into his assessment here. In that regard, numerous courts

have either explicitly accepted conclusions that Dr. Norris reached in his peer reviews, or have

confirmed claim determinations that were based on a peer review by Dr. Norris. *See, e.g., Ovist*

*v. Unum Life Ins. Co. of Am.*, 14 F.4th 106, 121-22 (1st Cir. 2021) (affirming denial of benefits,

and finding Dr. Norris' opinions reliable and reasonable); *Dorris v. Unum Life Ins. Co. of Am.*,

949 F.3d 297 (7th Cir. 2020) (affirming denial of benefits that was based, in part, on Dr. Norris'

peer review); *Pellegrino*, 2021 WL 3912238, at *11, (upholding determination based on "Dr.

Norris's findings (which were based on a review of the claim file)"); *Hans v. Unum Life Ins. Co.*,

o. CV 14-2760, 2015 WL 5838462 (C.D. Calif. Oct. 5, 2015) (finding Plaintiff did not establish

disability by a preponderance of the evidence, based in large part on opinions of Dr. Norris and

Unum's other reviewing physicians); *Nelson v. Unum Group Corp.*, No. 1:13-cv-58, 2014 WL

3908183 (E.D. Tenn. Aug. 11, 2014) (same); *Luna v. UNUM Life Ins. Co. of Am.*, No. CV 20-

202 JCH-JHR, 2021 WL 4307294 (D.N.M. Sept. 22, 2021) (same).

In addition, most of the cases Plaintiff cites in an effort to discredit Dr. Norris often do not

evidence any criticism of his evaluation in the particular case. Indeed, the most common theme

in those cases is that the court discounted the conclusions of peer reviewers who did not examine

the claimant. *See, e.g.*, *Barnes v. Unum Life Ins. Co. of Am.*, 2020 U.S. Dist. LEXIS 256497, at

*26-27 (E.D. Tenn. Nov. 24, 2020); *Boykin v. Unum Life Ins. Co. of Am.*, No. 19-cv-137, 2022

WL 456213 (E.D. Calif. Feb. 15, 2022); *Dewsnup v. Unum Life Ins. Co. of Am.*, No. 17-cv-126,

2018 WL 6478886 (D. Utah. Dec. 10, 2018).  However, concluding that a peer review is

unreliable simply because the reviewer did not examine the claimant is contrary to *Nord*, 538 U.S. at 834, and *Hobson*, 574 F.3d at 91.

Beyond that, even where a decision cited by Plaintiff criticized a conclusion by Dr. Norris, that criticism was based on an analysis of the evidence in the administrative record in that case. Yet Plaintiff is essentially asking the Court to disregard the evidence in *this* case, and the reliability and reasonableness of Dr. Norris' evaluations in *this* case, and to simply conclude that Dr. Norris should not be credited. But the Court cannot avoid evaluating the actual medical evidence regarding Plaintiff's claim, and the validity and reliability of the conclusions that each of the doctors (including Dr. Norris) reached based on that evidence.[13] In short, the Court should assess the weight it gives to Dr. Norris' conclusions regarding Plaintiff's functional capacity in the same way as it assesses all of the medical opinions in this case – by the extent to which they are consistent with and supported by the available medical evidence.

---

[13] Plaintiff also argues that Dr. Norris made "multiple" factual misstatements, although he challenges only two of Dr. Norris' statements. Pl. Brief, pp, 37-39. First, Dr. Norris' statements related to Plaintiff's alleged "hip condition" are addressed at Pages 36-37, *infra*, and therefore not restated here. Second, Plaintiff attacks Dr. Norris' interpretation of Plaintiff's lumbar MRI as showing "mild to moderate multilevel degenerative changes without evidence of severe nerve root impingement or spinal canal narrowing." In doing so, however, Plaintiff compares Dr. Norris' report of August 5, 2020 (LTD 1731) with the MRI report from September 2020, which had not even taken place at the time Dr. Norris rendered his August 2020 opinion. Pl. Brief, p. 37-38. Plaintiff also ignores Dr. Norris' statement later in the same report, which further explained that "[i]maging described mild to moderate degenerative findings of the lumbar spine, but there was no evidence of severe nerve root impingement, significant central canal stenosis, or other findings that would preclude sedentary activity." LTD 1734. Even putting aside Plaintiff's misdirection, Dr. Norris' conclusions are entirely consistent with the imaging reports *and with Plaintiff's physician Dr. Beer's conclusions*. Neither the October 2017 nor the September 2020 MRI reports indicate any "severe" findings of any kind, which Dr. Norris accurately noted. Moreover, in his June 11, 2019 office notes, Plaintiff's treating physician Dr. Beer stated that he "personally interpreted" the 2017 lumbar MRI (the only one about which Dr. Norris possibly could have been opining in August 2020), and found it "most significant for: a small left sided protrusion at L2-3 that ***does not cause any significant central canal or nf stenosis***" LTD 659. Accordingly, Plaintiff's unwarranted attacks on Dr. Norris should be rejected.

### 2. There is no credible evidence that Plaintiff is disabled due to shoulder, hip or cognitive issues

Presumably recognizing the fundamental weakness of his contention that back pain that did not require prescription pain medication has disabled Plaintiff from a white-collar, sedentary job, Plaintiff has asserted continuously shifting arguments that some combination of his shoulder, hip and/or cognitive issues have caused or contributed to his disability. Those contentions are unsupported by a preponderance of the credible evidence.

Dr. Beer's contemporaneous medical records do not attribute any disability to Plaintiff's shoulders. Indeed, on August 27, 2020, Dr. Beer attributed Plaintiff's disability to "pain in his thoracic and lumbar regions." LTD 1779. In the same records, Dr. Beer states that passive range of motion of the bilateral shoulders was "not pain provoking." *Id.* Similarly, Plaintiff's October 2018 FCE does not include any shoulder issue among the listed areas of complaint or diagnoses. LTD 00128-129. Moreover, Plaintiff told First Unum that his shoulder pain was more of a "moderate pain with aching" versus a sharp pain (LTD 547) and acknowledged that physical therapy helped his shoulder, but he nonetheless stopped. LTD 719. In any event, Dr. Norris recommended certain restrictions and limitations as to reaching above/to/up to shoulder level, to address Plaintiff's should osteoarthritis and tendinopathy. LTD 1734.

Plaintiff argues that the record contains "ample evidence demonstrating abnormalities of the hip that indicate a functional impairment." Pl. Brief., p. 39. This is simply not true. In fact, while selectively quoting from the September 2020 hip MRI, Plaintiff disingenuously leaves out the first listed finding – "Unremarkable MRI of the left hip joint, without significant labral tear or degenerative change." LTD-1790. Similarly, Dr. Beer's office note states that passive range of motion of the bilateral hips was "not pain provoking." LTD-1779.

Regarding cognitive issues, Plaintiff does not argue in his Trial Brief that any medication he is taking impairs his cognition. Nor could he credibly do so, because it is undisputed he was not taking pain medication, and certainly not opioid pain relief. LTD 660, 749. Given that evidence, it does not speak well of Dr. Beer's credibility that he asserted, in a residual functional capacity questionnaire he completed for Plaintiff's administrative appeal, that Plaintiff "suffers from medication side-effects that cause drowsiness, fatigue, headaches, and cognitive deficits." LTD 1680. Dr. Beer never identified what those medications were, or why Plaintiff was taking them; moreover, as Dr. Norris pointed out, Dr. Beer's contemporaneous medical records do not contain any reference to the side effects noted in Dr. Beer's questionnaire response. LTD 1734 (Dr. Beer's "opinion that the EE [employee] suffered from drowsiness and impairing cognitive deficits due to medication side effects is not supported by the medical records, especially considering that the EE has not been prescribed or filled medications for pain in 2019 or 2020 per pharmacy report in 2019 and OV [office visit] notes in 2020, and the insured did not report impairing medication side effects at contemporaneous OVs."). To the extent Plaintiff now contends that pain resulted in cognitive impairments, the credibility of any such claim is undercut by the fact that, if his pain was so severe that it interfered with his ability to think, one expects Plaintiff would seek, or his doctors would prescribe, medication or more aggressive treatment to alleviate that pain.

Separate from the lack of a credible cause of cognitive impairment, Plaintiff does not point to any evidence in the Administrative Record that he had any testing (formal or otherwise) to identify or measure his claimed impairment, but relies on supposition, such as a statement in the FCE that his symptoms would "*presumably* affect his focus, attention span, and concentration[,]" and a statement from a vocational consultant that "chronic pain *can cause* faulty memory, [and]

loss of concentration[.]" Pl. Br., pp. 29, 20 (emphasis added). Neither assertion – by non-medical personnel – is evidence that Plaintiff had those difficulties.

### 3. *The Vocational Evidence Does Not Establish Disability by a Preponderance of the Evidence*

The vocational evidence upon which Plaintiff relies in support of his claim is contradicted by objective evidence. Moreover, at least one key issue upon which Plaintiff's vocational reports relied was not identified in any records until after Plaintiff's benefits were terminated, and certainly did not appear in the record before January 3, 2020.

First, the Plan defines "Regular Occupation" as the "occupation you are routinely performing when your disability begins. Unum will look at your occupation ***as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location***." LTD Policy at 33 (emphasis added).

After a thorough analysis of the vocational documents in the claim file, Plaintiff's FCE and Vocational Report, and several industry guidelines, including the Enhanced Dictionary of Occupational Titles ("eDOT"), the U.S. Department of Labor Bureau of Labor Statistics Occupational Outlook Handbook (2018 Edition), the U.S. Department of Labor's Revised Handbook for Analyzing Jobs, First Unum properly determined Plaintiff's occupation was sedentary. LTD 618-19.

Vocational evaluators for both Parties agreed that Plaintiff's occupation is most closely categorized as Insurance Underwriter. LTD 1013, 1816-17. The DOT description of "Underwriter" does not provide any occupational tasks which would require travel. Because it was a resource upon which Plaintiff relied, Ms. O'Kelley also reviewed information from O*NET for the "Underwriter" occupation and, while she noted that O*NET is a tool not generally used for disability determinations, she nonetheless noted that (1) driving was not important to the performance of

the occupation and working in a vehicle was reported as "never" by 63% of respondents and (2) the tasks outlined in O*NET did not include tasks which would require travel. LTD 1817.

Finally, Ms. O'Kelley reviewed eDOT for "Underwriter Commercial Property Insurance" and noted that it did not provide any requirements for selling, marketing or meeting with clients. LTD 1818. Based on a collective review of this information, Ms. O'Kelley determined that the activities of direct selling and meeting with clients were specific to Plaintiff's employer, and not a requirement of his occupation, as defined by the Plan. *Id.* Moreover, Ms. O'Kelley noted that any travel required for Plaintiff's job "would not occur daily for this occupation and would occur incidentally and would not increase the overall capacity requirement of Sedentary work." LTD 1818. Ms. O'Kelley also assessed the limitations and restrictions recommended by Dr. Norris on August 5, 2020, and again concluded that those restrictions would not prevent Plaintiff from performing his occupation within the national economy. *Id.*

While Plaintiff's vocational resource, Ms. Leopold, acknowledged that Plaintiff's occupation most closely relates to the DOT definition of "Underwriter," which requires only sedentary capacity, she nonetheless opined that the reported "travel demands" of Plaintiff's actual job "elevated" Plaintiff's occupation above the sedentary demand level, and to a light duty demand level. LTD 1013-1014; 1773. However, because the Plan defines "Regular Occupation" as it is "normally performed in the national economy" (LTD Policy at 33), the Court must interpret Plaintiff's occupation in accordance with the terms of the Plan, not as it was performed by the Plaintiff at his particular job. *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp.3d 458, 484-485 (S.D.N.Y. 2015); *Nelson v. Unum Life Ins. Co. of America*, 421 F. Supp.2d 558, 569 (E.D.N.Y. 2006) (the question is not what plaintiff's specific duties were at her employer, but what the duties of a customer service representative in the national economy are). *See also*, *Wagner v. First Unum Life*

*Ins. Co.*, No. 02 CIV. 9135 (RLC), 2003 WL 21960997, at *3 (S.D.N.Y. Aug. 13, 2003), *aff'd*, 100 F. App'x 862 (2d Cir. 2004) (upholding First Unum's determination where it concluded that inability to travel "would not prevent her from performing the material duties of her job, because travel to underdeveloped countries is not a generalized requirement of her occupation as it appears in the national economy.")

Accordingly, Ms. Leopold's assessment of Plaintiff's employer-specific travel requirements was improper and should be rejected. Here, the nationally accepted resources reviewed by both party's vocational experts acknowledge that, in the national economy, the occupation of Underwriter requires physical demands at the sedentary level.

To be sure, the assessment whether Plaintiff's regular occupation as performed in the national economy required travel was not simple, as evidence by the fact that Katherine Rolph, who performed the initial vocational assessment, reported that "it is reasonable that travel would be required." LTD 458, 619. However, subsequent vocational assessments by Rusty Peavy and Ms. O'Kelly determined that any travel was a requirement of Plaintiff's job at Swiss Re, not his regular occupation as performed in the national economy. Mr. Peavy was specifically asked to evaluate the issue of travel, and he concluded that it was a function of Plaintiff's job at Swiss Re: "the frequency [of travel] cannot be determined as it is based on business need." LTD 802. Ms. Leopold essentially agreed, because she stated that "work demanded that he be reliably available to travel to potential and existing clients."  LTD 1773 And Ms. O'Kelly concluded that "[a] review of the DOT information for the occupation of Underwriter (DOT 169.267-046) did not provide any occupational tasks which would require travel." LTD 1807.

As a separate matter, Plaintiff's FCE makes an unsupported conclusion that Plaintiff suffered significant side effects of some unidentified medication, including drowsiness and fatigue.

LTD 962. There is nothing in the contemporaneous medical records to support this claim. Indeed, Plaintiff and Dr. Beer have disclaimed that Plaintiff was taking any narcotic pain medication, so there is no support in the record for what, if any, medication was supposedly causing this drowsiness and fatigue. Moreover, while the FCE notes that Plaintiff became "fatigued" during testing, LTD 970, this was not a symptom that Plaintiff reported to his treating physicians outside of the FCE. Indeed, the first time any notation of reported "fatigue" appears in Plaintiff's contemporaneous medical records is March 6, 2020, after First Unum terminated Plaintiff's benefits. LTD 916. Dr. Beer's office visit notes from January 2017 through November 2018 do not list fatigue at all, much less as a disabling factor. LTD 160-173. Despite the total lack of contemporaneous evidence in the medical records that Plaintiff suffered from drowsiness or fatigue at or around January 2, 2020 – from medication or any other reason – the FCE nonetheless concludes that Plaintiff cannot tolerate an 8-hour work day due in part to increased fatigue. LTD 987. Likewise, the Vocational Assessment states that Plaintiff's ability to work is impaired by his "constant and severe fatigue." LTD 908. These conclusions are simply not supported by the contemporaneous record, and undermine the credibility of both the FCE and Vocational Report.

### 4. The SSDI Determination Does Not Support Plaintiff's Claim*Error! Bookmark not defined.*

Plaintiff argues that his disability "is supported by and corroborated by" the findings of the Social Security ALJ Levine in his August 4, 2021 Decision. SSDI 1-8. Plaintiff's argument in this regard is factually and legally baseless.

First, there is no dispute that the Court's review is presumptively limited to the Administrative Record. *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 60 (2d Cir. 2016) ("[W]hen reviewing claim denials, whether under the arbitrary and capricious or de novo standards of review, district courts typically limit their review to the administrative

record before the plan at the time it denied the claim."). This presumption can only be overcome by a finding of good cause. *Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 294 (2d Cir. 2004) ("the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause[.]"

Though the parties have stipulated that the SSDI decision should be part of the trial record, the fact that it did not exist when First Unum made its final determination, and therefore it was not considered as part of the administrative review, supports giving it little, if any, weight. The Second Circuit explained that "[t]he doctrine limiting review of ERISA claims to evidence before the plan administrator was developed to prevent federal courts from becoming substitute plan administrators and thus to serve ERISA's purpose of providing a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 318 (2d Cir. 2008) (internal quotation marks omitted).

There is another, substantive reason for giving the SSDI award little or no weight in the Court's assessment of First Unum's determination. Federal courts universally recognize that there are "critical differences between the Social Security disability program and ERISA benefit plans," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-833 (2003), resulting in "the eligibility criteria for Social Security benefits differ[ing] from the eligibility criteria under the Plan." *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 139 (5th Cir. 2016). As an initial matter, the ALJ's decision was based on a very different record than that before First Unum, and now before this Court. For example, the SSA considered medical records from 2021, which obviously were not available (nor could they have been) to Unum in 2019 and 2020. The ALJ also considered testimony of Renee B. Jubrey, an "impartial vocational expert," but it is not clear what information Ms. Jubrey provided. Finally, there is no mention in the ALJ's decision that he

considered any of the medical or vocational opinions developed by First Unum. Thus, the ALJ did not disagree with the conclusions of Dr. Weinstein, Sergile or Norris, because Plaintiff did not give those peer reviews to the ALJ. It is self-evident that fact finders who consider different bodies of evidence can reach different determinations regarding the same issue, without either determination being unreasonable or wrong.

Next, and significantly, even on the limited evidentiary record before it, the ALJ's decision actually supports First Unum's findings that Plaintiff had functional capacity that would not interfere with performing the material and substantial duties of his regular occupation. The SSA found that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a)…" except for conditions that have no relevance to his occupation (climbing, operating foot controls, pulmonary hazards). SSDI 4-5. And the SSA agreed that Plaintiff's "past relevant work" was sedentary. *Id.* at 6. Thus, the SSA's determination supports First Unum. The SSA opinion goes on to state, without explanation, that "[t]he demands of the claimant's past relevant work exceed the residual functional capacity." (*Id.*). A finding that is not explained and that appears to be inconsistent with the other findings in the award, should not be given any weight.

Finally, the SSA considered as a factor in its decision that Plaintiff was an "individual closely approaching advanced age" – defined by the regulations as ages 50 to 54. 20 CFR 404.1564. Pursuant to the regulations, when a person is closely approaching advanced age, the SSA will "consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." *Brown v. Colvin*, 146 F. Supp.3d 489 (W.D.N.Y. 2015) (noting that the Social Security Commissioner faces a more stringent burden

when denying disability to older claimants). No such factor or consideration of age exists in the definition of disability in First Unum's LTD Policy or LWOP Policy.

Each of the foregoing issues more than adequately demonstrates why it is a common scenario for the SSA to approve disability benefits under one set of criteria based on one evidentiary record, while an insurer like First Unum denies or terminates private disability benefits under the unique terms and conditions of an employer-sponsored plan and on another, more complete, set of evidence. *See*, *e.g. Addington v. Senior Vice President Hum. Res. Consol Energy, Inc.*, 841 Fed. Appx. 443, 448 (3d Cir. 2020) (claim fiduciary's review of plaintiff's claim "included vocational and medical assessments that were not considered by the SSA…" and that termination of LTD benefits while the plaintiff received SSDI benefits was not an abuse of discretion).

## IV. Plaintiff is Not Entitled to Benefits "Through the Present"

In both his Complaint and Trial Brief, Plaintiff seeks LTD and LWOP benefits from January 3, 2020 "through the present." Compl., ¶¶ 125, 141; Pl. Opp., p. 1. Regardless of the Court's ruling here, however, Plaintiff is not entitled to benefits "through the present" as a matter of law. The stipulated record that the Parties agreed to present to the Court does not contain any evidence of Plaintiff's medical condition or functional capacity beyond the October 29, 2020 information submitted by Plaintiff. Here, the LTD Plan requires proof of continuing disability, and expressly states that benefit payments will stop on "[t]he date you fail to submit proof of continuing disability." LTD Policy at 22. Accordingly, the Court is without any evidentiary basis upon which to determine if Plaintiff qualifies for benefits "to the present." *Chicco v. First Unum Life Ins. Co.*, No. 20-cv-10593, 2022 WL 973733 (S.D.N.Y. March 30, 2022) (remanding to First Unum for a determination as to whether Plaintiff qualifies for benefits since the date of the final denial of benefits); *Martinez v. Standard Ins. Co.*, 2021 WL 4592430 (5th Cir. Oct. 5, 2021) (reversing district court's award of "any-occupation benefits" through date of judgment, where no

such determination had been made by plan, and remanding to administrator for an initial deter-

mination of plaintiff's "any-occupation benefits."). Indeed, the evidence in the administrative

record stops in November 2020, when First Unum made its final determination.

Moreover, the LTD Policy provides that the definition of "Disabled" changes to the more

restrictive "gainful occupation" definition after twenty-four months of benefits (LTD Plan 16)

and there is no evidence in the Administrative Record to evaluate his claim under that definition.

## CONCLUSION

For each of the foregoing reasons, Plaintiff has not established by a preponderance of the ev-

idence that he is disabled pursuant to the terms of the Plan. Accordingly, First Unum is entitled

to judgment in its favor.

Dated: June 28, 2022

ROBINSON & COLE LLP

By: */s/ Patrick W. Begos*
Patrick W. Begos (PB4372)
*Attorneys for Defendant*
1055 Washington Boulevard
Stamford, CT 06901
Telephone No.: (203) 462-7500
Facsimile No.: (203) 462-7599